ATTORNEY GENERAL *vs.* BASIL WINSLOW FLYNN.

February 3, 1954. — February 17, 1954.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

April 12–15, 20, 21, 1954. — May 28, 1954.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*District Attorney. Supreme Judicial Court,* Jurisdiction, Removal of district attorney. *Public Officer. Trust,* Trustee's duty of fidelity, Purchase of trust property by trustee, Personal benefit of trustee from trust, Charitable trust.

In a proceeding for removal of a district attorney from office under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, the test was the fitness of the respondent to hold the office, and this court ruled that it had jurisdiction to inquire into his conduct in matters not related to his administration of the office and to remove him for conduct previous to his holding office demonstrating present unfitness to hold it. [415]

The jurisdiction of this court of a proceeding under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, to remove a district attorney from office was not affected by the fact that matters involved in the charges made against him pertained to a testamentary trust of which he was a trustee and might be passed upon by the Probate Court in its jurisdiction over the trust, nor was the doctrine of forum non conveniens applicable. [415–416]

On an information brought by the Attorney General against a district attorney under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, this court concluded that the respondent was unfit to hold his office and that sufficient cause had been shown for and the public good required his removal therefrom, and so ordered, where it was found after hearing on the merits that he, one of three trustees of a charitable testamentary trust, with the purpose of making a personal profit for himself, in two instances purchased from the trust in the names of straws real estate which he believed could be resold for amounts substantially larger than the prices involved in his purchases

and through receipts from such properties and subsequent resale thereof actually did realize large secret profits, and also accepted from the trust with respect to his purchases certain payments for services customarily made by the trust in connection with sales of its real estate, all without disclosing to his cotrustees that he was the real purchaser; that sums allowed the trustees in accounts prepared by him as paid to his secretary for services rendered by her to the trust were in fact received by him; that he caused certain personal insurance to be paid for by a corporation owned and operated by the trust; that he manifested a disposition to use the trust for his personal advantage; and that he failed in his duty to give to the Attorney General accurate and adequate information as to his management of the trust. [428–430]

INFORMATION, filed in this court on October 1, 1953, and afterwards amended, by the Attorney General seeking removal of the respondent from the office of district attorney of the Plymouth District under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, and alleging misconduct of the respondent in relation to a charitable trust under the will of Edward Y. Perry, late of Hanover, of which the respondent was one of the trustees.

The respondent filed a motion to dismiss, a motion to decline jurisdiction "in the nature of a motion of forum non conveniens," and a demurrer. These matters were heard on February 3, 1954, by *Qua*, C.J., *Lummus, Ronan, Wilkins, & Williams,* JJ.

*George A. McLaughlin,* (*Walter H. McLaughlin, Charles S. McLaughlin, & Arthur M. Gilman* with him,) for the respondent.

*Arnold H. Salisbury,* Assistant Attorney General, (*George Fingold,* Attorney General, *Charles S. Marsland, Jr., & Andrew T. Trodden,* Assistant Attorneys General, with him,) for the informant.

The following rulings and orders of the court respecting these matters were made on February 17, 1954:

RULINGS AND ORDERS OF THE COURT UPON
RESPONDENT'S MOTION TO DISMISS, MOTION
TO DECLINE JURISDICTION, AND DEMURRER.

These two motions and the demurrer came on to be heard together, and after hearing and consideration of the

same and of the arguments presented the court rules and orders as follows:

(1) The court rules that under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, it has jurisdiction to inquire into the conduct of the respondent in matters not related to his manner of administering his office. *Attorney General* v. *Tufts*, 239 Mass. 458, 482–483, 490.

(2) The court rules that it has jurisdiction to remove a district attorney for conduct occurring prior to his holding of that office, if that conduct is of sufficient gravity and is sufficiently recent to have genuine probative force bearing upon his present fitness to hold the office.

The statute is couched in the broadest terms with no qualifications or restrictions. Its only requirements are that "sufficient cause" be shown and that "the public good" require the removal. *Attorney General* v. *Pelletier*, 240 Mass. 264, 300. The test is the fitness of the man to hold the office. It has already been held that conduct of an officer during his next preceding term of office may constitute "sufficient cause" and may make it appear that "the public good" requires his removal. *Attorney General* v. *Tufts*, 239 Mass. 458, 481–482. This was held without "making a final and complete statement of the law." 239 Mass. at pages 481–482. To the same effect is *Attorney General* v. *Pelletier*, 240 Mass. 264, at page 300. The intervening election does not operate as condonation. The rule stated under (2) above inevitably follows from the previous decisions that the causes for removal are not limited to official conduct and that they are not limited to the present term of office. The statute depends for its constitutionality upon the control of the Legislature over the office of district attorney and upon the close relation between that office and the judicial system. *Attorney General* v. *Tufts*, 239 Mass. 458, 479–481. *Attorney General* v. *Pelletier*, 240 Mass. 264, 294–300.

(3) The court rules that the jurisdiction of this court under G. L. (Ter. Ed.) c. 211, § 4, is not affected by the fact that the Probate Court in its jurisdiction over the trust

might pass upon some of the matters set forth in the information.

Only this court has jurisdiction under the statute to remove the respondent from office.

(4) The court rules that the doctrine of forum non conveniens has no application to this case. See *Attorney General v. Pelletier,* 240 Mass. 264, at page 349.

(5) The court rules that the information contains allegations which, if proved, would constitute sufficient cause for removal of the respondent from his office for the public good and which call for the exercise by this court of its jurisdiction under the statute to hear the cause. See *Attorney General v. Tufts,* 239 Mass. 458, at page 490.

This does not mean that every separate charge stated in the information, taken by itself alone, states a sufficient cause for removal. See *Attorney General v. Pelletier,* 240 Mass. 264, at pages 348-349.

(6) The court rules that the allegations of the information are not so vague, indefinite, or inadequate as to render the information demurrable on that ground.

This does not preclude the allowance of a proper motion for specifications as to any portions of the information as to which further detail ought to be supplied.

In accordance with the foregoing rulings the court orders:

1. That the respondent's motion to dismiss be, and hereby is, denied;
2. That the respondent's motion to decline jurisdiction be, and hereby is, denied;
3. That the respondent's demurrer be and hereby is overruled. It is further ordered that the respondent file his answer and any motion for specifications on or before February 25, 1954.

By the Full Court,
STANLEY E. QUA,
*Chief Justice.*

Thereafter the respondent filed an answer and a motion for specifications; the informant filed certain specifications

pursuant to the order of the court on the respondent's motion therefor; and the respondent filed a motion, which was allowed, to strike out paragraphs 14 and 15 of the amended information for failure to specify as ordered.

The case was heard on the merits on April 12, 13, 14, 15, 20, and 21, 1954, by *Qua,* C.J., *Ronan, Wilkins, Spalding,* & *Counihan,* JJ.

*George Fingold,* Attorney General, (*Andrew T. Trodden, Arnold H. Salisbury,* & *Charles F. Marsland, Jr.,* Assistant Attorneys General, with him,) for the informant.

*George A. McLaughlin,* (*Walter H. McLaughlin, Charles S. McLaughlin,* & *Arthur M. Gilman* with him,) for the respondent.

On May 28, 1954, the following decision and order were entered:

Qua, C.J. After the order of the court filed February 17, 1954, denying the respondent's motion to dismiss and his motion to decline jurisdiction and overruling his demurrer, which order is to be reported with this opinion, and after the filing of specifications as ordered by the court in relation to certain numbered paragraphs of the amended information, and after the paragraphs numbered 14 and 15 had been struck from the information on motion of the respondent because the Attorney General had declined to specify as ordered, this cause was fully heard on the merits by a majority of the court as required by G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465.

On July 14, 1947, the respondent was appointed one of the trustees of a charitable trust created under the will of Edward Y. Perry, late of Hanover in the county of Plymouth. At about that time the personal property of the estate was inventoried at $126,809.56, and there were also some twenty-five parcels of real estate located in Hanover, Marshfield, and Hanson and appraised at $110,650. The will gave the trustees power to sell real estate without license from the Probate Court. There were two other trustees, Walter J. MacDonald, who, like the respondent,

was a lawyer, and John F. Twohig, who was not a lawyer. The respondent and Twohig were appointed trustees in place of two former trustees who had been removed by the Probate Court for maladministration of the trust in matters with which we are not now concerned. In the former proceedings the present respondent had acted as attorney for his present cotrustee MacDonald, who was a petitioner in those proceedings. Soon after the appointment of the respondent as trustee the office of the trust was removed to the law office of the respondent in Brockton. Thereafter the books of the trust were kept at the respondent's office by the respondent's secretary. The bank account of the trust and its financial affairs generally, including the preparation of probate accounts, were handled by the respondent or by his secretary under his direction. The trustees had adopted the policy of selling off the real estate of the trust, and by some time in the spring of 1950 they had disposed of practically all but two of the parcels. With some trifling exceptions, there remained unsold only the property known as the Perry homestead located in Hanson, consisting of a house in poor condition with about eighty-four acres of land, part of which was on the shore of a pond, and with two wood lots in addition of about twelve acres and nine acres respectively, and the property in Hanover known as the Hunt property, consisting of a house and about 18,309 square feet of land. The homestead with the woodland was appraised at various times at figures ranging from $12,000 down to $10,500. The Hunt property had been appraised at $5,500. In November, 1950, the respondent was elected district attorney of the newly created Plymouth District. See St. 1948, c. 423.

## 1. THE WINSLOW TRANSACTION.

Under date of June 15, 1950, at the instance of the respondent, the three trustees executed a formal agreement to convey the Perry homestead to one Arthur F. Winslow of Hartford, Connecticut, for $10,000 in cash, papers to be

passed on or before September 1, 1950. Winslow was a cousin of the respondent. The respondent represented to his cotrustees that Winslow would like to buy, and would buy, the property for $10,000 cash. We believe this representation was essentially untrue. It carries the connotation that Winslow actually intended to become a bona fide buyer on his own account. Winslow never signed the agreement to buy. There is nowhere in the case any evidence that before the agreement was signed by the trustees he had ever authorized the respondent to represent that he, Winslow, actually intended to buy this property; nor is there any evidence that he did intend to buy it or had any interest in buying it for himself at a price of $10,000, or at any price.

Under date of September 1, 1950, which was the date fixed for the conveyance in the unilaterally signed agreement, a deed of the Perry homestead running to Winslow was executed by the three trustees, and under the same date a mortgage back was given by Winslow to the trustees for $9,000, leaving only $1,000 to be paid in cash. These of course were not the same terms as those on which conveyance was to be made according to the partially signed agreement. That agreement made no provision for a mortgage back of $9,000 out of the purchase price of $10,000. Although the respondent testified that this deed and the mortgage back were both executed on or about the date they bear, to wit, September 1, 1950, serious doubt is thrown upon this by the fact that in both deed and mortgage in both the testimonium clauses and in the acknowledgments — four places in all — the date 1951 was first typed in and then changed by hand by the respondent to 1950. There was no explanation of this curious circumstance, and we are unable to find when the deed and mortgage were delivered, except that it was on or before February 12, 1951, when both papers were recorded.

There is no doubt that by the time of the delivery of this deed and mortgage the respondent was actually the purchaser from his own trust of the Perry homestead and the two wood lots. Winslow, although ostensibly the pur-

chaser and mortgagor, had no interest whatever in the purchase. He was merely a straw for the respondent. The respondent himself so testified. The respondent's explanation was that when the unilaterally signed agreement was made out in June, 1950, he believed Winslow would buy, but that before September 1 Winslow changed his mind and informed the respondent that he was not interested; and that the respondent then told his cotrustees that since he had represented to them that Winslow would buy, he, the respondent, would "take it over." This explanation we do not accept. There was much evidence tending to show, and we find, that the respondent's cotrustees did not know until long after the deed was recorded that the respondent was the real buyer.

Although the respondent had bought, ostensibly through Winslow, the homestead property and the wood lots for only $1,000 cash and a $9,000 mortgage, he did not pay the $1,000 or any part of it into the trust until May 4, 1951. Through Winslow he held title to the property from the date the deed was delivered until May 4, 1951, without having paid any money. His cotrustees did not know that "Winslow" had obtained title without paying any money. When the respondent made out a trustees' account for them to sign for the year 1950 he caused an item of $1,000 of "cash received" as of September 1, 1950, from the sale to "Winslow" to be inserted in schedule A, and a corresponding item of "cash on hand 1000" to be inserted in schedule C. No such cash had been received by the trust or was on hand during 1950. However, the respondent did cause this sum of $1,000 to be paid into the trust before the account was actually filed in 1951.

It was the practice of the trustees when real estate was sold to make a charge for "extra services" in showing it and in connection with the sale which should roughly compare with the commission that a broker might charge. Such charges were made by the three trustees in June, 1950, at the time the so called agreement was made for the supposed sale to Winslow. The respondent received $200 from

the trust for his share, although he himself was in fact the purchaser. He also received from the trust an allowance in one lump sum for services in "passing papers" in fourteen different transfers, including this transfer to "Winslow."

Shortly after acquiring the homestead property and the wood lots through the deed to Winslow the respondent began to make efforts to sell the property. He offered it to different people for $20,000. He testified, however, that in one instance he offered it for $10,000. He received $200 on account of an easement for wires across the property. In October, 1951, he sold one of the wood lots to Lot Phillips & Co., Corporation, for $1,901. He then caused his straw Winslow to convey the property to a Miss Stefani, who was a secretary in the respondent's district attorney office, and who thenceforward acted as his straw. He caused Miss Stefani to convey this wood lot to the Phillips concern by deed dated October 19, 1951. The trust released this lot from its mortgage but received nothing in return. The respondent kept the purchase price. After the conveyance of the wood lot the respondent continued to offer the remaining land at $20,000. On October 31, 1952, he received through Miss Stefani $300 from one Perkins for a forty-five day option to purchase the property for $20,000. This option was not taken up, and the respondent kept the $300. Early in 1953 he sold the remaining property standing in Miss Stefani's name, except the remaining wood lot, to Gil-Rich Realty, Inc., for $20,000, and caused Miss Stefani to convey to that corporation by deed dated February 2, 1953. He then paid off to the trust its $9,000 mortgage with accrued interest.

It thus appears that, if we take the respondent's date for the conveyance to Winslow, September 1, 1950, the respondent within a period of two years and five months, upon an original money investment of $1,000, had received a total of $12,401, not including what the trust paid him for services in selling to himself, and he still had left one unsold wood lot. This $12,401 was not all profit, however. There had been some expense for mortgage interest and other

items, partly offset by rents received. The respondent himself calculated his net profit at $11,236.68. For present purposes we accept that figure.

On August 4, 1953, after the administration of the Perry trust had become the subject of newspaper comment, after receiving two letters of inquiry from the assistant attorney general in charge of charitable trusts, after an interview with him, and after consulting counsel in his own behalf, the respondent paid to the trust $11,844.65. He claims that the difference between this figure and the figure of $11,236.68, which he says was his net profit, represents an overpayment by mistake on his part. He caused Miss Stefani to reconvey the unsold wood lot to the trust by deed dated August 11, 1953.

It is plain, and we find, that the respondent's purpose in buying the Perry homestead and the wood lots was to make a personal profit for himself. He testified that he intended to share any profit that might be made with one Dickinson who had supplied him with a part of the money to be applied in making the cash payment of $1,000 on account of the purchase. In his purpose of making a profit out of the trust property the respondent was eminently successful. He bought the property on terms highly favorable to himself. If he believed, as we find he did, that the property could be resold for substantially more than he was paying for it, his plain duty was to make every effort to sell it in behalf of the trust at a higher price. Nothing had happened between the time when the respondent bought and the time when he sold that would account for any substantial increase in value. He did not inform his cotrustees that he was the buyer. He kept the property at all times covered in the names of straws.

We find the charge in relation to the Winslow transaction is established to the extent hereinbefore set forth.

### 2. The Berry Transaction.

The second piece of real estate of the trust that remained unsold in 1950 was the so called Hunt property in Hanover.

By deed dated December 28, 1950, the three trustees conveyed this parcel to Dickinson, who was admittedly merely a straw for the respondent. The purchase price was $5,000, of which only $300 was to be paid in cash and the remainder by mortgage back from Dickinson to the trust for $4,700. The respondent did not inform the other two trustees that he was the real purchaser. The deed from the trustees to Dickinson and the mortgage back from Dickinson to the trustees were recorded on January 12, 1951. On January 13 or 14, 1951, one Berry paid to the respondent $100 on account of an intended purchase of this property by Berry for $6,200. Sometime in January the respondent's secretary drew up an agreement in writing dated "this [blank] day of January A. D. 1951," ostensibly between Dickinson as owner and Berry whereby Berry agreed to buy the property from Dickinson for that price. On March 27, 1951, Berry paid to the respondent a further sum of $1,000 on account of the purchase price, and signed the agreement, which still bore only the date of January, 1951. On or about April 26, 1951, the sale was completed. Berry paid the balance of the purchase price, and Dickinson gave a deed to Berry and his wife. The mortgage from Dickinson to the trust for $4,700 dated December 28, 1950, was discharged. In the meantime the $300 which was supposed to be paid to the trust in cash at the time of the deed to Dickinson had not been paid and was not in fact paid until May 4, 1951. The respondent had therefore made a profit of $1,200 out of his purchase of trust property and its sale to Berry before he had invested a cent of his own money.

Apparently the respondent asks us to believe that he knew nothing of Berry's possible interest in buying the property until after the deed from the trust to Dickinson dated December 28, 1950, although Berry actually paid a deposit the day after or the second day after that deed was recorded. The respondent testified that the trust had held the property for sale at $5,000 for approximately a year and a half, and that he had assisted in trying to sell it, but there was no evidence that he or Dickinson had mani-

fested any interest in buying it until about the time of the deed to Dickinson. There was a sign on the property giving the names of the three trustees. The respondent places the time of the offer to the trustees to buy for $5,000 at approximately a week prior to December 28, 1950, the date of the deed. There was evidence that the Berrys had looked at the property and that Mr. Berry had talked to the respondent over the telephone about buying it and had been given by him the price of $6,200 shortly before Christmas of 1950. On all the evidence it would strain our credulity beyond the breaking point to believe that the respondent bought this property on December 28, 1950, without previous knowledge that Berry might become a purchaser at a substantial advance over the price of $5,000 for which the trust conveyed to Dickinson on that day. We find that the respondent had such knowledge.

But even more important is the fact that according to his own testimony the respondent's purpose in buying this Hunt property was to make money. If he believed, as obviously he did, that there was money to be made on that property it was his clear duty as a trustee, in this instance as in the case of the Winslow transaction, to exert his best efforts to make money for his trust rather than for himself.

In this instance, as in the case of the Winslow transaction, the respondent received money from the trust for "extra services" in connection with the sale of the property to himself. In this case the amount was $100. This transfer to Dickinson was also one of those for which the respondent received from the trust the lump sum previously mentioned for "services" in "passing papers."

On September 14, 1953, after he had been questioned by the Attorney General in person about this Berry transaction, the respondent paid into the trust $1,200 for the profit that he had made.

We find that the charge in relation to the Berry transaction is established to the extent hereinbefore set forth.

### 3. Other Charges Established.

Beginning in the year 1949 a monthly payment of $50 was made by check of the trustees payable by name to the respondent's secretary employed at his private law office. These payments were designated in the trustees' accounts to the Probate Court prepared and signed by the respondent at first as "Labor" and later as "Secretarial Fee." They were ostensibly for services performed by the secretary in behalf of the trust. Such services were actually rendered by her, but she did not in fact receive the payments. She indorsed the checks and the proceeds were in fact received by the respondent. Presumably the respondent paid the secretary for working in his office. What amount he paid her did not appear and is immaterial. The material circumstance is that the sums allowed to the trustees in their accounts as paid to this secretary for her services were in fact paid to the respondent, and the accounts prepared and filed by him were misleading and untrue with respect to these payments. These monthly checks for the same amounts continued to be turned over to the respondent after the secretarial work had been reduced by more than half in consequence of the sales of real estate by the trust. During all this period each of the three trustees was receiving from the trust for services in general the sum of $50 a month in addition to all other sums received.

The trust owned and operated a business known as Whitman Grain and Coal Company. Beginning in 1949 and continuing into 1953 the respondent allowed the trust operating as Whitman Grain and Coal Company to pay for so called "Blue Cross" insurance covering himself and his family, although he was not an employee of Whitman Grain and Coal Company, but was a joint owner in his capacity as trustee. On October 7, 1953, after the present proceedings were begun, he paid Whitman Grain and Coal Company $275.55 to reimburse the trust for payments made in his behalf. He testified that he had decided the Attorney General "would even go after that," and he would pay the

bill before the Attorney General "started looking for something like that."

The amended information and the specifications include charges that the respondent gave false answers to inquiries by or in behalf of the Attorney General for the purpose of impeding his investigation. As to charges of this character it seems enough to say that we are satisfied and we find that the respondent did not make to the Attorney General and his assistants full and frank disclosure of the respondent's administration of this trust. His general attitude was that he would admit only that which was already known or in process of becoming known and would remain silent or conceal as to matters that might not become known. It is a function of the Attorney General to enforce the due application of charitable funds and to prevent breaches of trust in the administration thereof. G. L. (Ter. Ed.) c. 12, § 8. It was the duty of the respondent to assist and not to obstruct.

### 4. CHARGES NOT ESTABLISHED.

The charge set forth in the eighth paragraph of the amended information that the respondent deceived his cotrustee MacDonald, after the latter had signed an account, by raising the amount of fees payable to the respondent as set forth therein was not proved. We find no wrongful conduct by the respondent in this matter.

The charges set forth in paragraph 9[1] of the amended information and in the specifications thereunder were not proved to any greater extent than as hereinbefore set forth.

The charges set forth in paragraphs 10 and 11[1] of the amended information and the specifications thereunder were not proved. We find that the respondent searched the titles of borrowers from the trust on mortgage security and performed such services as are habitually performed by attorneys acting for banks and others lending money, but so far as appears his charges were reasonable, and we find nothing wrong in these matters. Possibly one or two

[1] See footnote on page 427.

of such borrowers may have been at some time clients of the respondent, but this was not shown to have been more than a mere coincidence.

We find nothing reflecting upon the integrity of the respondent in the matter of his collection of an account owed by one Hatch to Whitman Grain and Coal Company as set forth in paragraph 12[1] of the amended information.

Paragraphs 14 and 15 of the amended information were struck out on motion after the Attorney General elected not to specify under these paragraphs.

Paragraphs 17 and 18 of the amended information and specifications thereunder relative to alleged false statements by the respondent to representatives of newspapers bear so lightly upon the decisive issues in the case that it seems unnecessary to make findings upon them.

CONCLUSION.

Under G. L. (Ter. Ed.) c. 211, § 4, as appearing in St. 1945, c. 465, upon which this proceeding is based, the ultimate questions are whether sufficient cause has been shown

---

[1] Paragraphs 9, 10, 11, and 12 of the amended information were as follows: "9. On divers dates since his appointment as a trustee of the trust, the respondent demanded and received from the trust . . . sums of money purportedly in payment for services to the trust which he either never performed, or for which he was not legally entitled to be paid, all as he well knew. 10. On divers dates since his appointment as such trustee, the respondent demanded and received from persons who had borrowed monies from the trust sums of money in payment for services to them in the matter of procuring and processing such loans. 11. On divers dates since his said appointment, the respondent persuaded his fellow trustees to join with him in lending monies of the trust to certain of his clients, without disclosing to his said fellow trustees that the prospective borrowers were his clients or that he would receive fees for legal services to the borrowers upon the completion of such loans; and thereafter the respondent demanded and received payment of such fees from such borrowers. 12. Among the assets of the trust during all times pertinent hereto was an operating business enterprise known as Whitman Grain & Coal Company (hereinafter referred to as the Whitman Company), which was wholly owned and controlled by the trust. On or about May 5, 1951, one Otis Hatch, of said Hanover (hereinafter called Hatch), a client of the respondent, owed the Whitman Company $536.60; on or about said date, the respondent sent to the Whitman Company his check for $402.45, upon which appeared the following notation: 'Otis F. Hatch Account $536.60, less 25% $134.15, $402.45.' Said payment was made by the respondent out of funds which had been borrowed by Hatch from the trust, for the purpose of paying said bill, among others, in full, all as the respondent well knew. The respondent at no time disclosed to his fellow trustees that he intended to charge or had charged a collection fee for procuring the payment of said Hatch account to the Whitman Company out of the proceeds of said loan." — REPORTER.

and whether it appears that the public good requires the removal of the respondent from his office of district attorney. That these are the governing considerations sufficiently appears, with adequate citations of previous decisions under the statute, from the rulings already made in this cause, which are hereby ratified and confirmed.

The district attorney is the officer charged with the duty of enforcing the law in his district by bringing offenders to trial and securing their conviction and punishment. The office of district attorney is one of the most important offices in the Commonwealth. The primary duty of all government — the protection of life and property — depends upon the efficient, capable, and honest performance of the duties of this office. Those duties are in very large part quasi judicial. They are of the most delicate nature. They demand of the holder of the office the exercise of a high degree of discretion and sensitive moral judgment upon the conduct of others. The public good requires that such an office be held by a man capable of keen and accurate discrimination between right and wrong and of firm determination not to allow himself to stray from the course of upright and honorable conduct. The respondent had been appointed trustee of a trust fund of large size devoted by its donor to the relief of the poor who might be in want of the necessities of life in the towns of Hanover, Hanson, and Pembroke and to assist worthy young people in acquiring better educations. This was an appointment to a highly responsible position. The court in making the appointment placed confidence in the respondent's fidelity and integrity. Every dollar needlessly or wrongfully taken from the trust fund would reduce by just so much the amount available for the generous and worthy purposes to which the donor had devoted the fund; yet there was no named beneficiary having any standing to call the trustees to account or to confirm or consent to anything the trustees might do. The principal reliance must be upon their own sense of what is just and right. The respondent in the manner previously stated made large secret profits for himself by covertly procuring the sale to

himself through straws of property of the trust. The effect upon the trust was the same as if he had embezzled the money. We cannot accept his explanation that he did not know this was wrong. He was a man of mature years, a graduate of a well known law school. He had had years of practice. He had served for some time as an assistant clerk of the courts and had been an assistant district attorney. He had been instrumental as an attorney in procuring the removal of two former trustees of this same trust for irregularities in administering the trust. The law is clear that, with some exceptions in peculiar circumstances not here applicable, a trustee cannot sell to himself. We cite only a few of our own decisions. *Jones* v. *Dexter*, 130 Mass. 380. *Bowen* v. *Richardson*, 133 Mass. 293, 296–297. *Hayes* v. *Hall*, 188 Mass. 510. *Vinal* v. *Gove*, 275 Mass. 235, 241. *Jose* v. *Lyman*, 316 Mass. 271. *Boston Safe Deposit & Trust Co.* v. *Lewis*, 317 Mass. 137, 140–141. The principles of these cases are well known to the legal profession. Moreover, no profound legal learning is required to comprehend that one appointed to manage and conserve a trust fund for the benefit of others cannot rightfully manipulate the fund for his own benefit to the detriment of the proper beneficiaries. In addition to making secret profits by sales the respondent took for himself the salary checks of his secretary and concealed the fact by using her name in his accounts. He took money to pay for his personal insurance. He has done all these things while being well paid from the trust for services legitimately rendered. He has manifested a disposit on where possible to use the trust for his personal advantage. There is no place in the administration of a trust for "kick backs," "rake offs," or perquisites. And, finally, the respondent failed in his duty to give to the Attorney General accurate and adequate information as to the respondent's management of a charitable trust.

The evidence discloses the respondent as a man lacking in the sound moral perceptions and in the steadfast moral character necessary for the exercise of the enormous powers

of the office of district attorney over the lives and fortunes of other men and for the creation and retention of public confidence in the administration of that great office. However reluctantly reached, the only conclusions possible are that sufficient cause has been shown and that the public good requires the removal of the respondent from his office.

Adopting the form employed in previous cases, the following order is made:

Now on this twenty-eighth day of May, in the year of our Lord one thousand nine hundred and fifty-four, by and before a majority of the Justices of the Supreme Judicial Court, namely, Stanley E. Qua, Chief Justice, and James J. Ronan, Raymond S. Wilkins, John V. Spalding, and Edward A. Counihan, Jr., upon the information brought by the Attorney General of the Commonwealth against Basil Winslow Flynn, after hearing all the relevant evidence offered on behalf of those interested herein, and listening to arguments, and after due deliberation and consideration, and all and singular the premises being seen and understood, and it being made to appear to said court that certain of the allegations of said information are proved to be true to the extent set forth in the judgment filed, and that sufficient cause is shown for the removal of said Basil Winslow Flynn from the office of district attorney for the Plymouth District, and that the public good requires said removal, therefore it is considered by said court, all of said Justices concurring and they being a majority of the Justices of said court, that the said Basil Winslow Flynn do not in any manner concern himself further about the holding of or exercising the said office of district attorney for the Plymouth District, but that he be and is hereby removed therefrom, and prejudged and excluded from holding or exercising the said office.