ARTHUR H. VINAL & others *vs.* AROLINE C. GOVE, executrix.

MABELLE GUNTHER *vs.* AROLINE C. GOVE, executrix, & another.

Suffolk.    February 4, 5, 1931. — April 2, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, SANDERSON, & FIELD, JJ.

*Trust,* Trustee's duty of fidelity. *Equity Pleading and Practice,* Master: findings.

The property of a real estate trust consisted of land and an apartment building thereon, subject to a mortgage for $100,000. The trust was unsuccessful from the beginning, and could not have earned enough to show a profit even if the property had been unencumbered. A succeeding trustee continued in office for a year, in which period he personally advanced money for interest and taxes, and paid off notes of the trust amounting to $30,000 by placing a second mortgage. This mortgage was assigned to the trustee's wife, who paid for it out of her own money. She also was the owner of a majority of the shares of the trust. At the end of the year, the trustee notified the shareholders of the trust of its unprofitable condition, that he was unable to pay the mortgage interest and that the property would be sold by the first mortgagee in foreclosure at a certain time. The trustee could not have prevented the foreclosure except by further personal contributions or contributions by the shareholders. At the foreclosure sale, the property was bid in, in behalf of the trustee's wife, by his son at his direction at a price of $103,000. The conduct of the trustee in dealing with the trust was *bona fide* and without intent to defraud its shareholders or creditors; and his conduct at the foreclosure sale was not "antagonistic to the performance of his duties." In purchasing the property, his wife was actuated at least in part by a desire to protect the amount of her second mortgage and did not desire or intend to cheat either the creditors of the trust or the other shareholders. The property at the time of the sale did not exceed $130,000 in value. In a suit in equity by shareholders and creditors of the trust against the trustee and his wife for an accounting and to have the purchase of the land by the wife declared void, it was *held,* that

(1) The defendant wife, as second mortgagee and shareholder, had an interest in the property to protect;

(2) The rule of law, preventing either a trustee or his wife from purchasing property of the trust at a foreclosure sale, therefore was inapplicable, the sale being for a fair price and free of fraud;

(3) In the circumstances, the suit could not be maintained.

Upon all the facts and evidence in the report of a master in the suit in equity above described, including a finding that the fair market value of the property at the time of the foreclosure sale was $155,000, it was *held*, that the finding as to value was inconsistent with the other findings; and that there was no error in a conclusion by a judge who heard the suit thereafter that a "valuation in excess of $130,000 is not warranted."

Two BILLS IN EQUITY, filed in the Superior Court on July 17, 1913 and September 11, 1913, respectively.

The first bill was against William H. Gove and the second against him and his wife, Aroline C. Gove. Both bills sought an accounting as to the affairs of Bay State Road Trust, of which the defendant William H. Gove was trustee. The second bill also sought to have it adjudged that the conveyance to the defendant Aroline C. Gove of the real estate of the trust was fraudulent and void.. Upon the death of William H. Gove, Aroline C. Gove, as executrix under his will, was admitted as a defendant. The suits were referred to a master for hearing together. Material facts found by the master are stated in the opinion. By order of *Gray*, J., there were entered an interlocutory decree sustaining one of the defendants' exceptions, as described in the opinion, and otherwise confirming the report; and a final decree dismissing the bills. The plaintiffs appealed from both decrees.

*A. L. Taylor*, (*F. J. Johnson* with him,) for the plaintiffs.
*J. W. Morton*, for the defendants.

PIERCE, J. These are appeals by the plaintiffs from interlocutory decrees modifying a master's report and from final decrees dismissing two bills in equity, one by a creditor and the other by certain stockholders of the Bay State Road Trust. The allegations in both bills and the issues raised under the pleadings in both cases were practically the same. Both cases were referred to the same master to be heard together, and his reports in all material matters are identical except for descriptions of the parties. The reports were confirmed in the Superior Court with the exception of his finding as to the market value of the property involved in 1912.

The Bay State Road Trust, hereinafter called the trust, was organized on May 1, 1905, for the purpose of purchasing certain real estate situated at the corner of Bay State Road and Deerfield Street, in Boston, and erecting thereon an apartment house which was to be conducted and managed by the trustee. In pursuance of the authority given under the trust deed, the first trustee obtained through a savings bank mortgage $100,000, and by the sale of one thousand shares of the stock raised an additional $100,000, and with the money thus secured purchased real estate and erected thereon an apartment house at an approximate cost of $200,000. The first trustee, one Evans, acted as trustee from May 1, 1905, to December 12, 1911. "The total income for five years was between $63,000 and $64,000; the total expenses for something over five years nearly $92,000, and of this sum the interest on the first mortgage is only $24,000 for six years." Despite the facts that the trust project was a losing proposition financially from the start, that the expenses exceeded the income and the trust would have lost money had the shareholders owned the building free of the mortgage, over $21,000 "were paid in dividends."

Sometime in 1911, William H. Gove, one of the defendants and the owner of five shares of the trust, who was also the husband of the defendant Aroline C. Gove, the owner of five hundred forty shares of the total issue of one thousand shares, became dissatisfied with Evans's management and retained accountants to examine the affairs of the trust. When he learned from their report that the trust was in a serious condition, he requested and forced Evans to resign, and secured his own election as trustee. During the next year Gove found out that the trust "could not be operated at a profit . . . during that year he personally advanced money out of his own pocket to pay mortgage interest and taxes on the property." He found that Evans had borrowed $30,000 represented by notes outstanding, and that the noteholders were pressing for payment and would not renew them unless Gove indorsed the renewal notes individually and as trustee. He was unwilling and

unable to do this, and therefore negotiated a second mortgage on the trust property to the amount of $30,000. This mortgage was assigned by the mortgagee to the defendant Aroline C. Gove, "who paid for said mortgage out of her own estate and the proceeds were used to retire the notes for $30,000 above referred to." After the experience of one year, on December 10, 1912, Gove sent out a statement of the condition of the trust to the stockholders. This letter set forth that no money was available for the payment of interest and taxes and other bills, that he had advanced money in payment of taxes and interest and did not care to make any further advances, and that he had notified the bank that he was unable to pay the interest late in 1912. This letter of December 10, 1912, further stated that "on account of the non-payment of $2,000 due for interest October 1, 1912, the property of the Trust has been advertised to be sold under the mortgage, December 26, 1912, at three o'clock in the afternoon, on the premises." He listed the various sums of his own money, amounting to over $3,500, which he had advanced. He summarized the report of the accountants employed to investigate Evans's management, and pointed out that in addition to the first mortgage of $100,000, Evans had borrowed $30,000 on notes and had thus reached the limit of the borrowing power of the trust under the declaration of trust.

The master found, at the request of the defendant, that "Gove could not have prevented the foreclosure except by personal contributions from his own funds or by obtaining the necessary amount from the shareholders or otherwise and that unless this was done the foreclosure was a natural outcome of the condition of the Trust at that time." The letter further stated that as the writer saw no prospect of any substantial improvement in the affairs of the trust, he would not make any further advances out of his own funds, and that he "did not think . . . [he] ought to ask any one else to do what . . . [he] would not venture to do" himself; that, consequently, he left the interest on the first mortgage unpaid, which obliged the mortgagee to foreclose. One of the shareholders testified before the master in rela-

tion to this letter "that because of this letter he considered that the affairs of the Trust were hopeless and that he had lost all his money." The master found that "this letter . . . was a fair statement of the condition of the Trust," and that it seemed only a natural inference therefrom by the witness that he had lost all his money.

Gove did not call any meeting of the stockholders to consult in regard to raising money to pay the instalment of interest due under the mortgage and to avert the threatened foreclosure, and did not ask any of the stockholders to advance funds for that purpose. The foreclosure sale was held on December 26, 1912. There were eight or nine people present. Mrs. Gove's son bid in the property in her behalf for $103,000. Of this sum $28,000 was paid in cash by her and a note for the balance was secured by a mortgage taken by the foreclosing mortgagee. Gove was present at the sale and his son bid under his direction. The second mortgage above referred to was held by Aroline C. Gove under an assignment. The master found in respect to the sale to Mrs. Gove "that the decision that the property should be bid in by Mrs. Gove was arrived at by William H. Gove who handled all of her affairs in connection with her interest in the Trust." He also found "that in bidding in the property Mrs. Gove was actuated at least in part by a desire to protect the amount of her second mortgage, but as to whether this was her sole motive . . . [he was] unable to say," and further "that Mrs. Gove did not desire or intend to cheat either the creditors of the Trust or her co-shareholders." However, neither of these had knowledge of her plan to purchase the property at the foreclosure sale. The master found that Gove was not engaged in any scheme to defraud creditors and shareholders and to secure the property for his wife and himself; that his election as trustee was the result of a failure of the trust to earn any income though managed by Evans to the best of his ability; and he declined to find that Gove's conduct at the foreclosure sale "was antagonistic to the performance of his duties."

The reported evidence as to the fair market value of the property at the time of the sale was widely divergent. The

land cost the trust $60,000, and the building, including the permanent improvements added through 1911, cost $144,270 and was carried as an asset on the books of the trust from 1906 down to 1911 at sums varying from $190,333 in 1906 to $205,317 in 1911. One real estate expert estimated the value of the land and the buildings in 1912 at about $150,000, while the original trustee set the value at $195,000. The valuation of the tax assessors of Boston for the years 1910, 1911, 1912 and 1913 was $150,000. At separate times two different savings banks loaned $100,000 on the property as a first mortgage. The accountants employed by Gove set a figure of $126,797 as the total value. The trust showed no profit producing power, and would have shown none had it been unencumbered by the first mortgage. In 1922 Aroline C. Gove sold the property for $103,000, "which was the best price she could secure, and secured it from the only man who would make a bid on it."

Upon the evidence set forth in his report the master found "as a fact, that the fair market value of the property of the Bay State Road Trust in 1912 was $155,000." The judge found that "A valuation of $155,000 is hardly consistent with the finding that under honest and competent management the property never made a profit and did not earn enough to pay the interest on the first mortgage of $100,000"; that it is not "consistent with the finding of fact that after attempting for many years to sell the property the defendant was finally able to sell it for only $103,000"; that "The finding as to valuation appears plainly inconsistent with the finding of the master that the facts stated in the letter of . . . Gove, dated December 10, 1912, were true and that the natural inference from these facts was that the shareholders' investment had been lost"; and he found that a "valuation in excess of $130,000 is not warranted."

Each plaintiff seeks to have Gove and his wife charged with the difference between the value of the property as found by the master and the price paid for the property at the foreclosure sale. The plaintiff Gunther is the assignee of a claim of the original trustee against the trust estate

for compensation for services rendered and expenses, both items totalling $15,343.49. The plaintiffs in the other suit were shareholders in the trust. The defendant William H. Gove died during the pendency of the present suits and the defendant Aroline C. Gove has been summoned in as his executrix.

A trustee in the management of property held by him in trust cannot sell such property to himself or to a third person for his direct or indirect personal advantage from its sale. Nor does it make any difference that the purchase was made under a foreclosure sale at public auction held by a first mortgagee. The reason for the rule was said by Lord Eldon in *Ex parte Bennett*, 10 Ves. Jr. 381, 393, to be that "it would not be safe, with reference to the administration of justice in the general affairs of trust, that a trustee should be permitted to purchase; for human infirmity will in very few instances permit a man to exert against himself that providence, which a vendor ought to exert, in order to sell to the best advantage; and which a purchaser is at liberty to exert for himself, in order to purchase at the lowest price." The rule applies regardless of the fairness of the price paid, for "if a trustee can buy in an honest case, he may in a case, having that appearance; but which from the infirmity of human testimony may be grossly otherwise." *Ex parte Bennett*, 10 Ves. Jr. 381, 385. It applies to purchases by a trustee as agent for others as well as to purchases for himself. *Oberlin College* v. *Fowler*, 10 Allen, 545. *Dyer* v. *Shurtleff*, 112 Mass. 165. *Brown* v. *Cowell*, 116 Mass. 461, 465. *Morse* v. *Hill*, 136 Mass. 60. *Hayes* v. *Hall*, 188 Mass. 510. *Williams* v. *Scott*, [1900] A. C. 499. If the trustee sells the property to himself the *cestuis que trust* may insist upon a reconveyance of the property from the trustee or from any person who purchased from him with notice or knowledge that he had purchased from himself, upon the payment of the purchase price where there has been no actual fraud; or he may hold the trustee for the actual value of the property at the time of the sale; or, if the trustee has sold it in excess of the price paid by him, he may recover such excess. *Morse* v. *Hill, supra. Hayes* v. *Hall, supra.* The rule extends with

equal force to the purchase of trust property by the wife of a trustee of that property. The intimacy of the marriage relation renders purchases by her fraught with temptation to abuse of the trust. *Hayes* v. *Hall, supra. Davoue* v. *Fanning,* 2 John. Ch. 252. *Bassett* v. *Shoemaker,* 46 N. J. Eq. 538. *Hartman* v. *Hartle,* 95 N. J. Eq. 123. *Wilmington Trust Co.* v. *Carrow,* 14 Del. Ch. 290. *In re Holley's Estate,* 211 Iowa, 77. *In re Moore,* 51 L. J. (N. S.) Part I, 72.

Where, however, the trustee or his wife has an interest in the trust property which she or he can protect only through purchase, it would be harsh to interdict such purchase absolutely. Aroline C. Gove, as a holder of a majority of the stock and as a second mortgagee, had such interests to protect. Had she not purchased at the foreclosure sale her investment as mortgagee, and otherwise in the trust, would have been wiped out. Had the property been sold by the trustee for an amount over and above what would be necessary to pay the first mortgage, it is plain she would have had an interest in the surplus which she could enforce by appropriate proceedings. *Pilok* v. *Bednarski,* 230 Mass. 56. She could therefore purchase the trust estate either in person or through her husband, provided the price was fair and the sale free from fraud. *Anderson* v. *Butler,* 31 S. C. 183. *Hickley* v. *Hickley,* L. R. 2 Ch. Div. 190. The master found no evidence of fraud in the conduct of either the husband or the wife prior to the foreclosure sale, and further found that Gove's conduct at the sale was not in conflict with his duty as trustee to secure the highest price. Cases forbidding a trustee to purchase in order to protect his interest in the trust property where the interest can be protected in other ways are distinguishable. See *Bassett* v. *Shoemaker, supra. Davoue* v. *Fanning, supra.*

We think the finding of the master as to the value of the estate was inconsistent with his other findings for the reasons stated by the trial judge, who was in a position to draw his own inferences from the subsidiary findings of the master. *Nichols* v. *Atherton,* 250 Mass. 215, 217. *Robert* v. *Perron,* 269 Mass. 537, 541. It is unnecessary to make a further

analysis of facts found or inferred by the master or of the cases cited in the plaintiffs' brief.   It is sufficient to say that none of the cases cited required that the judge should have reached a conclusion of law or fact that the premises when sold exceeded in value $130,000.   It results that in each case the decrees must be affirmed with costs.

*Ordered accordingly.*