KAREN LEE SHAPIRO, administratrix,[1] & another[2] vs.
HAROLD GRINSPOON and others.[3]

No. 88-P-688.

Hampden. March 13, 1989. — July 21, 1989.

Present: BROWN, DREBEN, & WARNER, JJ.

*Contract*, Sale of real estate, Performance and breach. *Damages*, Liquidated
damages. *Penalty*.

Language in an agreement for purchase and sale of certain real property, pro-
viding that the buyers would pay one-half the amount of any penalty up
to $400,000 which the sellers' mortgagee might demand for prepayment
of a mortgage on the property, when construed in light of common sense
and the plain intent of the parties, did not entitle the buyers to terminate
their obligation under the agreement after the mortgagee demanded a
penalty of $625,000, where the sellers agreed to pay the entire amount
by which the penalty exceeded $400,000. [600-601]

In an action to recover deposits paid pursuant to an agreement for purchase
and sale of certain real property, the judge correctly concluded that the
provision of the agreement permitting the defendant sellers to retain the
deposits as liquidated damages provided a reasonable forecast, as of the
time of execution of the agreement, of the damages that would result
from the plaintiffs' breach. [602-603]

In determining the enforceability of a liquidated damages provision in an
agreement for purchase and sale of certain real property, a judge, upon
proper foundation, could properly consider evidence of the price paid
for the property in a profitable sale subsequent to a breach of the agree-
ment by the prospective buyer, to the extent that such evidence is relevant
to the value of the property at the time of the breach. [603-605]

CIVIL ACTION commenced in the Superior Court Department
on March 11, 1986.

---

[1] Laurence J. Shapiro, an original plaintiff, died on December 30, 1988,
and the administratrix of his estate has been substituted.

[2] Robert P. Regan.

[3] William W. Young, who, with Grinspoon, was a general partner in a
limited partnership called The Regency Park, and Richard M. Gaberman,
attorney for Regency and escrow agent for the transaction which is the
subject of this case.

The case was heard by *George C. Keady, Jr., J.*

*Edgar L. Kelley* for the plaintiffs.

*Frederick S. Pillsbury* for the defendants.

WARNER, J. This appeal concerns the plaintiffs'[4] attempt to secure the return of a deposit made by them in an unsuccessful commercial real estate transaction. The questions presented are whether the plaintiffs had the right to terminate a purchase and sale agreement and, if not, whether a liquidated damages clause in the contract is enforceable. After a bench trial in the Superior Court, a judge ruled against the plaintiffs on both issues.

We draw the essential facts, which are not challenged on appeal,[5] from the judge's memorandum of decision. In the late summer of 1985, the parties began negotiations for the purchase by the plaintiffs of an apartment complex in Agawam owned by The Regency Park. The plaintiffs were made aware that Metropolitan Life Insurance Company (Metropolitan) held a $6,500,000 mortgage on the property, which would mature on October 1, 1994, and which did not allow for prepayment until October 1, 1990. The defendants began discussions with Metropolitan about the amount of a prepayment penalty; the defendants offered $400,000, but it then appeared that Metropolitan would demand more. The plaintiffs were kept informed of the discussions with Metropolitan but not of the details.

On October 30, 1985, the parties executed a letter of intent which detailed the essential terms of the transaction, including those with respect to the prepayment of the Metropolitan mortgage, which were later to be included in a purchase and sale agreement. The plaintiffs paid in escrow a deposit of $50,000.

---

[4] We refer throughout to the original plaintiffs.

[5] In the plaintiffs' statement of facts and throughout their brief, they all but ignore the judge's findings and instead make record references to testimony and exhibits. In addition, the statement of facts is improperly rife with argument, based on the plaintiffs' indulgent adoption of evidence favorable to them. No contention is made that any of the judge's findings is clearly erroneous. See Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). We, of course, accept those findings, which are fully supported by the evidence.

On December 16, 1985, representatives of Metropolitan met with the defendants and rejected the prepayment offer of $400,000. Agreement was reached on a figure of $625,000, subject to approval by higher authorities of Metropolitan.

The purchase and sale agreement was executed by the parties on December 23, 1985, and provided for a purchase price of $16,500,000, a closing date of February 14, 1986, and the plaintiffs' right to extend that date for a period of 45 days, on 14 days' notice and a nonrefundable payment of $100,000. The plaintiffs deposited in escrow an additional $450,000. On the matter of the prepayment of the Metropolitan mortgage, the agreement provided in relevant part:

> 9. *Seller's Present Mortgage.* Buyer acknowledges that Seller's present mortgagee, Metropolitan Life Insurance Company ("Metropolitan"), has imposed upon Seller a prohibition against the early payment of the present mortgage. *Both Seller and Buyer agree that they shall pay a maximum of Two Hundred Thousand ($200,000) Dollars each to Metropolitan* in order to obtain a discharge of the mortgage on payment of the outstanding principal and accrued interest by Seller at the time of the Closing. *In the event that Metropolitan shall refuse to accept such payment, or agree to a payoff of its mortgage with a maximum prepayment penalty of $400,000 or less, then either party shall have the right to terminate this Agreement in which event the deposits hereunder and all interest accrued thereon . . . shall be refunded to the Buyer and the parties shall have no further obligations to each other.* . . . In the event that Metropolitan shall require a payment less than $400,000, each party shall be liable for one-half (½) thereof. At its option Seller may elect to increase the purchase price to be paid by Buyer by the amount of the prepayment penalty otherwise payable by Buyer hereunder, in which event Buyer shall not also be obligated to pay such penalty. (Emphasis supplied.)

Although precision of date is lacking (because the evidence did not give foundation), the judge found that, when the purchase and sale agreement was executed, the defendants had not informed the plaintiffs that the $400,000 prepayment penalty was unacceptable to Metropolitan. The plaintiffs had not been told that an agreement on the figure of $625,000 had been made, subject to final approval by Metropolitan. In early January of 1986, the defendants told the plaintiff Shapiro that the prepayment penalty would likely be $625,000 and requested that the plaintiffs consider paying one-half of that amount. There followed during the next two to three weeks further discussions between the defendants and Shapiro about the prepayment. During this time the plaintiffs neither rejected nor accepted the defendants' request to share equally in the payment of $625,000 to Metropolitan; "Shapiro skirted the issue."

On January 28, 1986, Metropolitan sent a letter to the defendants approving the $625,000 figure. The plaintiffs were informed of the authorization on January 31, 1986. At the plaintiffs' request, the defendants, on February 4, 1986, sent to the plaintiffs copies of the Metropolitan letter and of the note and mortgage. In an accompanying letter to Shapiro, received on February 5 or 6, the defendants said: "Since the demand by Metropolitan exceeds the $400,000 provided in our contract and since your maximum obligation under the contract is $200,000, we have elected to assume the difference. However, we are still hopeful that you would be willing to share equally the excess of the Metropolitan request as was discussed with [an associate of Shapiro's] last week."

By letter of February 7, 1986, the plaintiffs' counsel wrote to the defendants that "my client does hereby elect to exercise his right under paragraph 9. of the Purchase and Sale Agreement to terminate said Purchase and Sale Agreement and does hereby request return of his deposit." In response, the defendants advised the plaintiffs that the closing would be held as scheduled on February 14, and that the deposit would not be returned.

Shapiro then attempted to "revitalize" the proposed transaction, but the plaintiff Regan "wanted out";[6] Shapiro was unable to find another partner. On February 14, 1986, the defendants attended the scheduled closing and were ready, willing and able fully to perform their obligations under the purchase and sale agreement. The plaintiffs failed to appear.

The defendants shortly later entered into a new arrangement with another buyer, on terms which will be discussed below. A letter of intent was executed on March 26, 1986, a purchase and sale agreement was signed on April 26, 1986, and the transaction was consummated on June 26, 1986.

In the meantime, Regan had obtained financing and in mid-April the plaintiffs informed the defendants that the plaintiffs were then ready to perform. The defendants later told the plaintiffs that the property was no longer available.

### *The Plaintiffs' Attempted Termination of the Purchase and Sale Agreement.*

The judge correctly concluded that the plaintiffs' attempted termination of the purchase and sale agreement on the ground that Metropolitan called for payment of more than $400,000 as a prepayment penalty was ineffective. He reasoned that, while a literal reading supported the plaintiffs' position, the purpose of the termination provisions of paragraph 9 of the agreement was to ensure that neither of the parties would be obligated to pay in excess of $200,000 toward the prepayment. The aim of the contribution provision was not to limit the amount of money paid to Metropolitan regardless of the source of payment. The latter interpretation would, the judge said, conflict with common sense and the plain intent of the parties. The construction which the judge adopted, and which we approve, " 'is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It [interprets the Agreement] as a business transaction entered

---

[6] The judge found that, since the execution of the letter of intent, the plaintiffs had made "minimal and unsuccessful efforts" to obtain financing. On April 17 and 18, 1986, an associate of Shapiro's informed the defendants that the reason the deal did not go through as planned was that the plaintiffs were unable to obtain financing.

into by practical men[7] to accomplish an honest and straightfor-
ward end.' " *Keating* v. *Stadium Management Corp.*, 24 Mass.
App. Ct. 246, 252 (1987), quoting from *Clark* v. *State St.
Trust Co.*, 270 Mass. 140, 153 (1930). See *Shea* v. *Bay State
Gas Co.*, 383 Mass. 218, 223 (1981). See also *deFreitas* v.
*Cote*, 342 Mass. 474, 477 (1961); *Bossi* v. *Whalen*, 19 Mass.
App. Ct. 966, 967 (1985); *Tremouliaris* v. *Pina*, 23 Mass.
App. Ct. 722, 727 (1987). As the defendants assumed the
obligation for the payment of the excess penalty, the plaintiffs'
refusal to perform was inexcusable.

The plaintiffs contend that they were entitled to terminate
the agreement because of the defendants' fraud and misrep-
resentation in the failure promptly to inform the plaintiffs of
the increased prepayment penalty demand by Metropolitan. In
an oblique argument, the plaintiffs say that the defendants'
failure to disclose somehow affected the plaintiffs' option to
extend the closing date for 45 days. It is enough to say that
no theory of fraud or misrepresentation such as the plaintiffs
argue was pleaded, and the judge's findings and conclusions
make clear that no such issue was tried to him. The plaintiffs
did not move that the judge amend the findings or make addi-
tional findings. See Mass.R.Civ.P. 52(b), 365 Mass. 817
(1974). We will not consider the question, as it was not
adequately put before the Superior Court judge. See *Bernard*
v. *Cameron & Colby Co.*, 397 Mass. 320, 323 (1986); *Gerber*
v. *Ty-Data, Inc.*, 5 Mass. App. Ct. 898, 898-899 (1977);
*Matthews* v. *School Comm. of Bedford*, 22 Mass. App. Ct.
374, 379 (1986). Cf. *J.C. Hillary's* v. *Massachusetts Commn.
Against Discrimination*, ante 204, 205-206 (1989).

Moreover, there is no merit to the plaintiffs' claim. Paragraph
9 of the agreement unequivocally limits the plaintiffs' contribu-
tion to the prepayment penalty to $200,000. As the judge
found, the defendants requested but did not demand an in-
creased contribution and agreed to assume the entire increase.
The plaintiffs' confused estoppel argument fails for the same
reasons.

---

[7] As the judge found here — sophisticated businessmen experienced in
the field of real estate development.

### The Liquidated Damages Provision.

The sale of the property was consummated on June 26, 1986. This transaction was not the same as the one contemplated with the plaintiffs. Included in the sale was a two family house valued at $100,000, and the buyer paid nothing directly toward the prepayment penalty.[8] The sale price was $17,100,000. The net difference between the sale price to the plaintiffs and that paid by the buyer was, therefore, $300,000.

Paragraph 12 of the purchase and sale agreement between the plaintiffs and defendants provided that, on default of the plaintiffs, "the deposits and accrued interest thereon shall be retained by [the defendants] and forfeited by [the plaintiffs] as liquidated damages in lieu of all other rights and remedies which [the defendants] may have against [the plaintiffs] at law or in equity. . . ." Under this provision, the defendants laid claim to the $500,000 in deposits made by the plaintiffs and the accrued interest. The plaintiffs argue that, as the defendants suffered no actual loss but made a profit of $300,000 on the sale, the liquidated damages provision may not be enforced because it would result not in compensation to the defendants but in a penalty to the plaintiffs.

The judge ruled that the sum of $500,000 was a reasonable forecast, at the time the purchase and sale agreement was executed on December 23, 1985, of damages likely to flow from a breach by the plaintiffs. He considered the experience and sophistication of the parties, the percentage (3.3%) of the liquidated damage amount in relation to the purchase price, the training and competence of plaintiffs' counsel and the vicissitudes of the real estate market. The judge declined, however, to look at the amount of liquidated damages in the context of the subsequent sale.[9] This, he said, would be "improper hindsight or Monday morning quarterbacking."

---

[8] In the agreement with the plaintiffs, there was also an apartment vacancy rent escrow provision. This is of no moment, however, as the plaintiffs did not make any payment pursuant to it.

[9] The judge did note that the evidence offered by the defendants to show actual damages from the plaintiffs' breach (in relation to the subsequent sale) to support the figure of $500,000 was "sketchy and inadequate."

Case law development of principles regarding the enforceability of liquidated damages provisions has been marked with ambivalence as a result of efforts to reconcile concepts of contract damages as purely compensatory, recognition of reasonable and freely bargained for liquidated damage clauses, and the hoary rejection of any results smacking of penalty. See the discussion in Farnsworth, Contracts § 12.18 (1982); *Giesecke* v. *Cullerton*, 280 Ill. 510, 513 (1917) ("[N]o branch of the law is involved in more obscurity by contradictory decisions").

The law of Massachusetts with respect to the enforceability of such clauses requires consideration at two points. "Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced. . . . But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages" (citations omitted). *A-Z Servicecenter, Inc.* v. *Segall*, 334 Mass. 672, 675 (1956). See *Security Safety Corp.* v. *Kuznicki*, 350 Mass. 157, 158 (1966); *Kroeger* v. *Stop & Shop Cos.*, 13 Mass. App. Ct. 310, 321-322 (1982); *Lynch* v. *Andrew*, 20 Mass. App. Ct. 623, 627-628 (1985), and cases cited; *Schrenko* v. *Regnante*, ante 282, 285 (1989), and authorities cited. See also *Begelfer* v. *Najarian*, 381 Mass. 177, 186 (1980); *Graves Equip, Inc.* v. *DeMatteo Constr. Co.*, 397 Mass. 110, 112-113 (1986). The judge was correct, for the reasons stated by him, in concluding that the amount of liquidated damages was a reasonable forecast, as of the time of execution of the contract, of damages which would result from the plaintiffs' breach.

In *Schrenko* v. *Regnante, supra* at 285-286, we discussed whether a later profitable sale should be considered in determining the reasonableness of a liquidated damages provision at the time of the required retrospective examination. We pointed out (at 286 n.4) the conflicting authority on the issue but, because we ruled that the clause was not a true liquidated dam-

ages provision, we reserved the question (at 286) for future resolution. But see *Lynch* v. *Andrew*, 20 Mass. App. Ct. at 628. We now hold that enforceability is not affected by a later profitable sale standing alone. The relevance, if any, of a later profitable sale is only to the value of the property at the time of breach. We think the disproportionateness and excessiveness of which our cases speak should be measured, as of the time of the breach, against the actual losses caused by the breach, that is, those uncompensated damages, as, for example, mortgage service costs, taxes, and legal and accounting expenses, which flow directly from a defaulting party's actions in connection with the transaction. The plaintiffs may show that, *at the time of breach*, the property could have been sold for a price higher than what the plaintiffs agreed to pay so as sufficiently to compensate the defendants for damages attributable to the breach. See *Vines* v. *Orchard Hills, Inc.*, 181 Conn. 501, 513-514 (1980). See also *Colonial At Lynnfield, Inc.* v. *Sloan*, 870 F.2d 761, 764-767 (1st Cir. 1989) (later profitable sale agreed to less than one month after breach and consummated two months thereafter). In that situation, the defendants would have suffered no loss. See Restatement (Second) of Contracts § 356 comment b and illustration 4. For this purpose, upon proper foundation evidence, the judge, in the exercise of sound discretion, may admit evidence of the price in the subsequent sale on the question of fair market value at the time of breach.

The rule which we adopt is consistent with compensatory damages principles, gives continued recognition, as our cases allow, to the validity of fair and freely bargained for liquidated damages provisions, preserves the power of the court to grant equitable relief on retrospective consideration, and provides a fixed and final point at which to measure damages. The imposition of a rule that a subsequent profitable sale having no relevance to fair market value at the time of breach should be considered in determining the reasonableness of an otherwise valid liquidated damages provision might well be regarded as a penalty on the seller. Should not, after all, a seller receive the *full* benefit of a rising real estate market subsequent to breach? See *Vines* v. *Orchard Hills, Inc.*, 181 Conn. at 513.

The rule which we adopt is also consistent with Restatement (Second) of Contracts § 356. That section recognizes the validity of liquidated damages clauses and the principle that the fixing of an unreasonably large sum in relation to provable actual damages constitutes an unenforceable penalty. As we have noted, this corresponds with the holdings of our cases on the subject. While § 356 does not speak explicitly to the situation of a subsequent profitable sale, it addresses retrospective "no loss" circumstances. See comment b ("If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable") and illustration 4 (Where contractor's delay in constructing race track grandstand caused no loss because owner was not licensed to operate, liquidated damages clause providing payment of $1,000 for each day of delay is a penalty).

In sum, the judge should first determine whether the actual damages to the defendants are difficult to ascertain. If they are, in view of the reasonableness of the forecast of those damages, the liquidated damages provision should be enforced. If not, he should consider whether the sum of $500,000 is so "unreasonably and grossly disproportionate" to, or is "unconscionably excessive" of, the actual damages caused by the breach so as to make the liquidated damages a penalty. See *A-Z Servicecenter, Inc.* v. *Segall, supra.* Finally, if the judge determines that the liquidated damages provision is unenforceable, and that the defendants' losses exceed the difference between the contract price and the saleable value of the property at the time of breach, he should award to the defendants the amount of the actual damages.

The judgment is vacated. The trial judge is to receive such further evidence as may be necessary to decide, consistent with the principles expressed in this opinion, the question whether the liquidated damages provision of paragraph 12 of the purchase and sale agreement is enforceable or, if not, to determine whether the defendants are entitled to recover actual damages.

*So ordered.*