**FLEET NATIONAL BANK,**
**Plaintiff, Appellee,**

v.

**H&D ENTERTAINMENT, INC., (f/k/a Dover Broadcasting, Inc.), and H&D Management, Inc., as general partner of each of H&D Broadcasting Limited Partnership, H&D Media Limited Partnership, H&D Radio Limited Partnership, and H&D Wireless Limited Partnership, Defendants, Appellants,**

v.

**PNC BANK, OHIO, N.A., Charles E. Giddens, individually, as receiver and as general partner of Media Venture Partners, Additional Counterclaim Defendants, Appellees.**

Nos. 96–1218, 96–1523.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1996.

Decided Sept. 24, 1996.

Stephen F. Gordon, Boston, MA, with whom Stanley W. Wheatley and Gordon & Wise, were on briefs, for defendants, appellants H&D Entertainment, Inc. and H&D Management, Inc., and claimants, appellants, Joel M. Hartstone, Barry J. Dickstein, Hartstone and Dickstein, Inc., Barry Dickstein & Co., Inc. and Joan Rory Hartstone.

John D. Hanify and Charles L. Glerum, Boston, MA, with whom Harold B. Murphy, Matthew P. McCue, Hanify & King, P.C., Paul E. Morton, Morton & McCrevan, Sara A. Walker, Joseph H. Zwicker, Terri L. Ross and Choate, Hall & Stewart, were on briefs, for appellees.

Before TORRUELLA, Chief Judge, BOUDIN, Circuit Judge, and BARBADORO,* District Judge.

BOUDIN, Circuit Judge.

At issue in this case are two different appeals, which we have consolidated, whose source is a lawsuit over unpaid bank loans. In one appeal, the borrowers contest the grant of summary judgment in favor of the lending bank; in the other appeal, the borrowers challenge the district court's approval of a sale by the receiver of borrower assets that secured the loans. In both instances, we affirm.

The background facts are largely undisputed. Between 1983 and 1988, Fleet National Bank ("Fleet") provided various interrelated loans and lines of credit to H&D Entertainment, Inc., and other associated corporations and partnerships (collectively, "the borrowers"); the borrowers were licensees or had other ownership interests in radio stations in various cities, and those assets secured the loans. In early 1994, Fleet concluded that the borrowers were in default and brought suit in two different federal district courts to collect upon different notes made or guaranteed by the borrowers.

On March 31, 1994, Fleet and the borrowers entered into a written settlement agreement. In exchange for Fleet's forbearance on the loans and dismissal of its law suits, the borrowers agreed to a repayment plan based on the sale of the radio stations. The settlement agreement provided that if the borrowers failed to comply with the plan's terms, this failure would end Fleet's forbearance obligation and also constitute the borrower's consent to the appointment of a receiver who would muster the assets and pay the debts.

Fleet claims that on November 30, 1994, the borrowers missed the first deadline established under the settlement agreement. As Fleet reads the agreement, the borrowers were required by that date either to have made a down payment of $6.4 million or to have in force purchase agreements with third parties obligating the latter to buy stations from the borrowers for that amount or more. The borrowers dispute this reading. The precise terms of the settlement agreement and other pertinent facts are set forth below.

On December 2, 1994, Fleet brought the present action in the federal district court in Massachusetts against the borrowers seeking over $12.9 million plus interest based on the notes and guarantees. Later, the borrowers counterclaimed. In the meantime, Fleet moved for the appointment of Charles Giddens as receiver for the stations. Giddens had an extensive background in appraising and selling radio stations and was a partner in a brokerage firm, Media Venture Partners, experienced in this field. In the past, Giddens had been appointed by courts to serve as receiver for radio stations and his firm had acted as broker in their sale.

The district court designated Giddens as receiver and thereafter approved his retention of Media Venture Partners to act as broker in the sale of the stations, comprising four principal properties in Connecticut, Illinois, Massachusetts and New Jersey. Giddens also retained The Zitelman Group, Inc., to prepare monthly financial statements for the stations and certain tax filings. The Zitelman Group was one of the few firms known to Giddens as experienced in radio station accounting and prepared to do such work on a temporary basis.

In March 1995, Media Venture Partners solicited bids from several hundred possible

* Of the District of New Hampshire, sitting by designation.

purchasers, widely publicizing the proposed sale. The largest bid, offering to buy all four station properties for approximately $15.3 million, was made by Spring Broadcasting, L.L.C. ("Spring"), which is associated in ownership and management with The Zitelman Group. The bid was subject to further examination by the bidder and further negotiations. At Giddens' request, The Zitelman Group resigned its bookkeeping tasks in June 1995, so that Giddens could freely negotiate a definitive purchase agreement with Spring.

Throughout the period, the borrowers made constant objections to the receiver, the proposed sale, and many other details. It appears that the prospective sale price being negotiated would not even cover in full the borrowers' debts to Fleet plus interest, let alone leave any equity for the borrowers. Thus, the borrowers had little incentive to cooperate in the receiver sale. Still, as the district court pointed out, the prospective deficiency did give Fleet reason to obtain as much as possible for the stations.

During the spring of 1995, Fleet and the borrowers filed cross motions for partial or complete summary judgment, the central issue being whether the borrowers had breached the settlement agreement. The cross motions were heard by a magistrate judge in June 1995. In early July 1995, the magistrate judge wrote a lengthy report and recommendation, concluding that Fleet's motion should be granted and the borrowers' motion should be denied. Ultimately, the district court approved the report and recommendations of the magistrate judge. This resolution would have disposed of most but not all of the claims on each side.

Giddens and Spring negotiated a final purchase price of just under $14 million during the summer of 1995, the lower price reflecting some deterioration of the stations and other adjustments. The magistrate judge held hearings, heard objections, and ultimately approved Giddens' proposal as to the procedures for completing the sale. This involved a second round of bidding, effectively inviting others to exceed the Spring offer. Information was furnished to prospective bidders, but no such bids were made. During this period the borrowers conducted discovery. In October and November 1995 the district court held hearings on the proposed sale.

During the fall, Giddens and Spring modified the proposed sale in certain respects. When the borrowers asked for a new round of competitive bidding because of the changes, Giddens conducted a third round of bidding ending in January 1996. No better bids were made. Further discovery was allowed to the borrowers. In January 1996 the district court held a further evidentiary hearing and then approved the sale from the bench. In April 1996, the district court issued a lengthy decision explaining its decision to approve the sale to Spring. *Fleet National Bank v. H&D Entertainment, Inc.,* 926 F.Supp. 226 (D.Mass.1996).

1. The borrowers have now appealed both from the order resolving the summary judgment motions and from the order approving the receiver's sale of the stations to Spring. At the outset, the borrowers argue that the summary judgment order is not properly before us, because it did not dispose fully of all of the claims or all of the counterclaims.[1] For this reason, the district court directed, on approving the magistrate judge's report and recommendation, "that final judgment be entered, pursuant to [Fed.R.Civ.P.] 54(b) and 28 U.S.C. § 1291."

The borrowers do not argue that the district court failed to make or support the finding required by Rule 54(b) for a separate judgment on less than all claims or parties, namely, that there is "no just reason for delay." Rather, they simply assert that there is case law forbidding the use of Rule 54(b) as to any claim that has been adjudicated as to liability but not damages. *E.g., Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 744, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976). This is the status of most of Fleet's

---

1. On Fleet's claims, seven of the eight counts involved computation of damages and at least the interest component remained to be resolved. As for the borrowers' counterclaims, the claims against Fleet were fully resolved but two other claims directed by the borrowers against the receiver were not.

claims against the borrowers, although Fleet says, citing *Herzog Contracting Corp. v. McGowen Corp.*, 976 F.2d 1062, 1064 (7th Cir.1992), that the mere calculation of interest due is ministerial and should not impair finality as to those claims.

■ The borrowers' objection to their own appeal is an ill-advised attempt to throw sand in the wheels. The district court's order approving the sale of the stations to Spring *is* properly before us—because by judicial gloss, such an order is treated as a final decision under 28 U.S.C., § 1291, because of its importance and irrevocable character.[2] And in reviewing the sale order, the borrowers are free to challenge any other ruling of the district court that underpins the sale order. *E.g., Avery v. Secretary of Health & Human Servs.*, 762 F.2d 158, 161 (1st Cir.1985); 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3921 (1977).

Here, the decision that the borrowers violated the settlement agreement does underpin the sale. The borrowers' violation is the central premise for the appointment of the receiver and the authorization permitting the receiver to sell the security. In short, the borrowers are free, in challenging the sale order, to make their central claim that they did not violate the settlement agreement. This would be so even if Rule 54(b) had never been invoked as to the summary judgment order, and even if the summary judgment order were not before us except as a premise of the sale order.

Conversely, the borrowers are mistaken in thinking that if they successfully challenged the Rule 54(a) designation, they could undo or invalidate the district court's decision on summary judgment. At best, they might *limit* this court's review to those aspects of the summary judgment decision that directly underpin the order approving the sale. But, so far as we can ascertain, the *only* attack made by the borrowers is on just such an aspect of the summary judgment decision, namely, the ruling that the borrowers breached the settlement agreement.

■ Thus, we have jurisdiction both over the order approving the sale and, incident to review of that order, over the only attack made on the summary judgment decision, regardless of *Herzog Contracting*. Further, the district court's order directed to the summary judgment motions is properly before us under Rule 54(b) at least insofar as that order completely disposes of most of the borrowers' individual counterclaims. Since we have plenary jurisdiction over the summary judgment order at least as to those claims, we are free to review—and affirm—both orders against the only attack made upon them.

■ 2. We turn now to the merits of that attack, namely, the district court's ruling that the borrowers breached the settlement agreement by failing either to make a $6.4 million initial payment by November 30, 1994, or alternatively to make sales agreements by that time in a comparable amount. Summary judgment is proper if there are no genuine issues of material fact and the law otherwise warrants judgment for the moving party; inferences and credibility are taken in favor of the opposing party; and review on appeal is *de novo*. *Roy v. Inhabitants of the City of Lewiston*, 42 F.3d 691, 694 (1st Cir. 1994).

The settlement agreement (in section 5(a)) required the borrowers either to have paid Fleet $6.4 million by November 30, 1994—which did not occur—or to meet an alternative condition stated as follows:

> On or prior to November 30, 1994, members of the Borrower Group shall have ... entered into binding [purchase and sale] agreements ... which shall have become fully effective as contemplated below, providing for the sale, to one or more purchasers, of two or more Station Combinations providing for aggregate Net Sales Proceeds of not less that $6,400,000 ....

---

**2.** *SEC v. American Bd. of Trade, Inc.*, 829 F.2d 341, 344 (2d Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2018, 100 L.Ed.2d 605 (1988); *Citibank, N.A. v. Data Lease Fin. Corp.*, 645 F.2d 333, 337 (5th Cir.1981). *See generally Forgay v.*

*Conrad*, 47 U.S. (6 How.) 201, 203–04, 12 L.Ed. 404 (1848); 15A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3910 (2d ed. 1991 & Supp.1996).

Later dates were provided by which two further specified payments (or sales contracts in like amounts) were to be made.

In addition, the settlement agreement provided (in section 5(e)) a trio of corresponding dates by which contracted-for station sales had to be completed. Thus, the first sale—contracted for by November 30, 1994, for not less than $6.4 million—had to be consummated by March 31, 1995. The five-month lag time was set to permit the necessary approval of license transfers by the Federal Communications Commission. This provision also required the borrowers to use their best efforts to obtain FCC approval, but it provided for reasonable extensions of time if, despite the borrowers' diligence, FCC approval were delayed past March 31, 1995 (or comparable dates for the other two installments).

In this court, both sides agree that by November 30, 1994, the borrowers had paid only $1,050,000 toward their debt. But, on summary judgment, the borrowers said that they satisfied the *alternative* obligation under section 5(a)—quoted above—by entering into an agreement to sell stations for enough money to generate the balance of the $6.4 million first payment. The facts as to what happened are largely undisputed; the disagreement before us turns on an issue of contract interpretation.

On June 23, 1994, well in advance of November 30, 1994, deadline, the borrowers contracted to sell two of the stations to a third party for amounts that, taken together with the prior $1 million payment, would have satisfied the November 30, 1994, obligation. This June 1994 sales contract conditioned the buyer's obligation on one of the radio stations attaining a listenership ranking of number 1 or 2 in the demographic category of adults age 25–54, as determined by the Arbitron ratings service. In July 1994, before consummation, new Arbitron ratings placed the station in seventh place and, in September 1994, the buyer terminated the sales contract.

On summary judgment and on appeal, the borrowers' central position has been that they complied with the literal terms of the settlement agreement because, in the words of section 5(a) quoted above, they "entered into" the required "binding" and "fully effective" contract "[o]n or prior to" November 30, 1994. The borrowers say that it is no part of their problem that their June 1994 contract to sell the stations lapsed well before November 30, 1994, and that no such sales contract was in effect on that date. We join the magistrate judge and the district court in rejecting the borrowers' reading of the settlement agreement.

 By its own terms, the settlement agreement is to be read in accordance with Massachusetts law. Under the precedents, ably parsed by the magistrate judge in his report adopted by the district court, a contract governed by Massachusetts law must be construed in accord with common sense, the likely intent of the parties and (in commercial cases) "as a business transaction entered into by practical [people] to accomplish an honest and straightforward end." *Shapiro v. Grinspoon*, 27 Mass.App.Ct. 596, 541 N.E.2d 359, 363 (1989). In short, words matter; but the words are to be read as elements in a practical working document and not as a crossword puzzle.

In all likelihood, the phrase "fully effective" in the settlement agreement refers to the satisfaction of certain conditions precedent specified in the settlement agreement itself (*e.g.*, the borrowers' filing of FCC applications for license transfer within 20 days). The magistrate judge—whose report the district court adopted—reasoned that the term "binding," to avoid superfluity, should be read to exclude "contingent purchase obligations which lapsed before ever ripening into absolute ones." Thus, he concluded that even on the most literal reading, the borrowers failed to meet the requirement.

In our view, it is uncertain whether the parties to the settlement agreement entertained any very precise notion of the meaning of "binding." The term is often used—redundantly in most contexts—to mean legally enforceable, *Black's Law Dictionary* 168–69 (6th ed.1990), and lawyers typically overwrite documents in this fashion. Further, at least one condition subsequent—that of FCC approval—was likely to remain unresolved until after November 30. But we think that

even if the term "binding" is given no special meaning, the result is the same based upon a common-sense appraisal, elsewhere stressed by the magistrate judge.

A self-evident aim of the settlement agreement was to make certain, by November 30, 1994, that future payment to Fleet of the $6.4 million was reasonably assured, assuming that actual payment had not already occurred. By law, the intended assurance would still be subject to the specific condition of FCC approval of the license transfers; and, of course, bankruptcy of the buyer or other intervening events might otherwise have frustrated the sale. But a sales contract that lapsed by its own terms prior to November 30 simply does not satisfy the obvious basic objective of providing reasonable assurance to Fleet.

To adopt this view does not require that we suppose that the parties had an exact and identical view of how every contingency or condition might satisfy or violate the settlement agreement. It is enough that reasonable parties would not have believed that this settlement agreement would be satisfied where the seller and buyer built into the sales contract a significant condition subsequent that defeated the obligation to buy and led to the lapsing of the contract prior to November 30. *See generally Cooke v. Lynn Sand & Stone Co.*, 70 F.3d 201, 204–05 (1st Cir.1995). Other variations might present more difficulties.

The borrowers have a fall-back position. They argue that the settlement agreement is at worst ambiguous and that, given the ambiguity, they are entitled to a trial to present evidence. Further, they point to the affidavit of Joel Hartstone, a leading figure in the management of the borrowers, that in the course of negotiating the settlement agreement,

> [T]here were specific discussions regarding the understanding that, if the Borrower Group fulfilled its good faith efforts obligations by entering into purchase and sale agreements, and if those agreements then terminated, the Borrower Group still would have until the principal payment deadline to consummate a transaction with a substitute purchaser.

Hartstone's gloss is highly unlikely as a statement of the parties' actual intent in section 5(a) but not quite impossible. It is highly unlikely because it is so serious a departure from the words and structure of the settlement agreement. Nothing in section 5(a) suggests that the contract signing was merely a "good faith efforts" hurdle; if that was the intention, it could easily have been expressed. Further, there is a lucid "best efforts" clause in section 5(e), pertaining to the borrowers' duty to seek FCC approval, but none in section 5(a).

Still, this would be a more difficult case if there were solid extrinsic proof—that is, evidence independent of the words of the settlement agreement—that the parties mutually intended section 5(a) to have the meaning claimed by Hartstone. The contract could rationally have been drafted as Hartstone urges, and sometimes parties fail to express themselves clearly in their drafting. This looks, at first glance, like a classic problem as to when extrinsic evidence may be offered to assist in contract interpretation, an issue largely governed by the parol evidence rule.

Somewhat simplified, the traditional version of the parol evidence rule is that a contract provision is either clear or ambiguous and that, in the former case, extrinsic evidence of negotiations is prohibited (if the contract was intended to be a complete integration). The modern approach, embodied in the *Restatement (Second) of Contracts* (1981), allows extrinsic evidence to "interpret" even a seemingly unambiguous contract, but not to vary or contradict its terms. *Id.* § 212(1) and comment b, and § 214(c) (1981). *See* Farnsworth, *Contracts* § 7.12 (1990). Massachusetts courts may tend toward the older view but not unequivocally so. *Compare ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261–62 (1st Cir.1991), *with Robert Indus. Inc. v. Spence*, 362 Mass. 751, 291 N.E.2d 407 (1973).

In this case, the elaborate settlement agreement was plainly intended as a complete integration and contains a clause to this effect. Thus, if the Hartstone affidavit were sufficient, it would pose nice questions as to whether Massachusetts law requires an am-

biguity before permitting extrinsic evidence, (if so) whether the agreement is ambiguous on the point at issue, and (above all) whether the Hartstone gloss can be said to explain—rather than contradict—the terms of the agreement. A factfinder might also have to decide whether Hartstone's affidavit correctly and fully described what was said at the negotiations.

But Hartstone's affidavit is not sufficient to raise a genuine issue of material fact. The affidavit contains only the conclusory assertion that in the negotiations there were "specific discussions" adopting his best-efforts interpretation. No dates, names or actual statements are supplied; not a single "specific" is set forth to demonstrate, or even illustrate, the content of the alleged "specific discussions." There is only some lawyer-like argument in a further paragraph as to why Hartstone's "best efforts" gloss conformed to the general tenor of the agreement.

Thus, the quoted passage in Hartstone's affidavit did not create a genuine issue of fact as to what happened at the negotiations. Nor did it supply specific facts that, if uncontested, might have affected the district court's own reading of the settlement agreement. *Cf. Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 456 (7th Cir.1991) (court may construe document if facts undisputed). It is just the kind of conclusory affidavit statement that is regularly disregarded by courts. *Wynne v. Tufts Univ. Sch. of Medicine,* 932 F.2d 19, 27–28 (1st Cir.1991); *Posadas de Puerto Rico, Inc. v. Radin,* 856 F.2d 399, 401–02 (1st Cir.1988).

■ 3. The remaining issue is whether the district court erred in approving the receiver's agreement to sell the stations to Spring. The district court has wide discretion in judging whether a receiver's sale is fair in terms and result and serves the best interests of the estate. *E.g., United States v. Peters,* 777 F.2d 1294, 1298 n. 6 (7th Cir. 1985). On review, an abuse of discretion standard governs such judgments, although subsidiary findings of fact are reviewed under a clearly erroneous standard and propositions of law are subject to *de novo* review. *Pye v. Teamsters Local Union No. 122,* 61 F.3d 1013, 1018 (1st Cir.1995).

In this case, the borrowers make almost a dozen different attacks on the sale, but only a few require discussion. The first attack, and the one most vigorously argued, arises from the fact that the winning bidder-buyer (Spring) was closely associated with the company (The Zitelman Group) that until June 1994 performed specified accounting services for the seller-receiver (Giddens). For present purposes, we omit the details of the association and (*arguendo*) treat the case as if Spring and The Zitelman Group were one entity.

■ Exceptions aside, a full-fledged fiduciary, such as trustee or a court-appointed receiver like Giddens, may not normally sell estate property to himself even if the terms are fair. *Restatement (Second) of Trusts* § 170 comment b (1959); Bogert, *The Law of Trusts and Trustees* § 543, at 248 (rev.2d ed.1993); Scott & Fratcher, *The Law of Trusts* § 170.1 (4th ed.1987); *see, e.g., Attorney General v. Flynn,* 331 Mass. 413, 120 N.E.2d 296, 302 (1954). The central reason is obvious: despite the safeguard of court oversight, the main assurance that the estate will be maximized is the zeal of the seller to secure the best price, and that zeal is likely to be tempered if the seller is selling to himself. Bogert, *supra.* The benefits of the general ban outweigh the risk that, in an individual case, the receiver might otherwise be the highest bidder.

■ The borrowers in this case urge that The Zitelman Group ought to be viewed as a fiduciary. While the label is not an exact term, *see SEC v. Chenery,* 318 U.S. 80, 85–86, 63 S.Ct. 454, 458–59, 87 L.Ed. 626 (1943); *Restatement (Second) Torts* § 874 comment a (1979), we agree with the district court that the specific accounting tasks allotted to The Zitelman Group were narrow, mechanical, and unrelated to the sale. The district court's findings to this effect, 926 F.Supp. at 242–43, have not been impeached. If The Zitelman Group had been engaged as the receiver's financial advisor on the sale, our view might be different.

■ In the alternative, the borrowers urge that the general ban on trustees buying

trust property ought to extend with the same force to *anyone* who is employed or engaged by the fiduciary, as The Zitelman Group was in performing accounting services. This is an arguable position (we ignore the possible significance of the June resignation), and there are a few cases that purport to support such a general ban on those who assist a fiduciary. *E.g., Donovan & Schuenke v. Sampsell,* 226 F.2d 804, 811 (9th Cir.), *cert. denied,* 350 U.S. 895, 76 S.Ct. 152, 100 L.Ed. 787 (1955); *In re Q.P.S., Inc.,* 99 B.R. 843, 845 (Bankr.W.D.Tenn.1989).

But, as the district court showed, it is not clear that the ban is uniformly followed even in those few jurisdictions that purport to adopt it. 926 F.Supp. at 244 n. 64. And the greater weight of authority is that any judgments as to disqualification of a non-fiduciary purchaser should be made on a case by case basis, taking account of all of the surrounding circumstances. *Id.* at 244; *Restatement (Second) of Trusts* § 170 comment e; Bogert, *supra,* § 543, at 254; Scott & Fratcher, *supra,* § 170.6; *see, e.g., Burlingham v. Worcester,* 351 Mass. 198, 218 N.E.2d 123, 126 (1966); *Gunther v. Gove,* 275 Mass. 235, 175 N.E. 464, 467 (1931).

The central reason for disqualifying the fiduciary as a buyer is that there is no one else who can similarly protect the estate's interest. *See* Bogert, *supra,* § 543, at 227–28. But where the purchaser is merely hired by the fiduciary to perform a discrete and narrow function unrelated to the sale, the fiduciary's guardian role is not automatically impaired. On the contrary, the fiduciary should still have every incentive to refuse to sell unless the purchaser is making the most attractive available offer. Thus, there is often little risk that the estate will be disserved by allowing the bid.

The general rule, by disqualifying the fiduciary as a bidder, might in some rare case foreclose the highest bidder, but only one such bidder is lost. If courts extend that circle of automatic disqualification, the risk becomes greater of harming the estate by limiting those who might offer the highest price. This is especially so in cases where the universe of serious buyers is likely to be small, as may well be the case here. And, of course, even without a rigid rule disqualification, an objecting party is free to argue on particular facts against a proposed sale to someone employed by the fiduciary.

■ Here, the borrowers do argue that The Zitelman Group's access to inside information did give Spring an advantage in framing its bid. If Spring had thereby bid less than it otherwise would have, interesting problems of remedy might arise—for it still might not help the estate to throw out the highest bid made to it. In all events, the district court specifically found that the information available to The Zitelman Group was not "confidential information or even raw financial data," 926 F.Supp. at 243, and was effectively available to other bidders. *Id.* at 233 n. 22.

On appeal, the borrowers make no effort to show that the monthly financial statements or any other information available to The Zitelman Group gave Spring any unique advantage over the information available to all bidders. On the contrary, the prospective bidders were supplied with more detailed and pertinent information than the limited data available to The Zitelman Group for accounting purposes. 926 F.Supp. at 233 & n.23. The borrowers' brief gives us no reason even to suspect error on this finding, let alone clear error.

■ We turn now to a quite different attack made by the borrowers on the sale. The borrowers assert that the receiver or his associated brokerage company, Media Venture Partners, accepted a "bribe" from Spring by agreeing to act as Spring's broker to buy another radio station in the Atlantic City area. Apparently, in April 1995, at virtually the same time that Spring submitted the winning bid in the first round, Spring offered Media Venture Partners a commission to secure Spring a second station in the same city.

To describe this offer as a proven bribe is a dramatic overstatement. Zitelman (who headed The Zitelman Group) himself testified at a hearing that the offer of a commission to Spring to procure a second station in Atlantic City was an arm's length agreement unrelated (except by Spring's desire for a duopoly)

to the receiver's sale of the borrowers' stations. The district court did not discuss the episode, perhaps because the borrowers developed very little evidence about it in the district court. The borrowers apparently did not even cross-examine Zitelman on this issue.

In this court, the borrowers simply repeat their charge that the commission was a bribe. If it were, the matter would be very serious. But the borrowers have adduced no evidence that the commission was intended by Spring as a bribe, regarded by Giddens or Media Venture Partners in that light, or that it had any effect on the sale of the borrowers' station. Out of an abundance of caution we have read what can be found in the record on the subject, and it does not alter our conclusion.

The borrowers might have argued that, as a prophylactic matter, a receiver who is selling property should be barred from any other dealing with the buyer in the same time frame. A federal judge, for example, could not normally accept a gift from a lawyer litigating a case before that judge. 5 U.S.C. § 7353(a)(1) (1994); *Code of Conduct for United States Judges* Canon 5(4). But the borrowers have made no effort to offer citations or arguments for such a prophylactic rule here; and it is certainly not self-evident that so broad a rule would make sense in the context of ordinary business transactions.

Finally, the borrowers offer a motley of other attacks on the sale. These include charges that Media Venture Partners helped Spring in "crafting" its bid by providing it help not afforded to other bidders; that the receiver concealed information from the court regarding bids submitted by other bidders; that adjustments in the sales contract between the receiver and Spring were unwarranted; that the second and third rounds of bidding were too hasty; and that the sale price ultimately fixed for the stations was too low in light of earlier appraisals.

These objections are answered in the district court's lengthy opinion approving the sale. The objections turn on the specific facts and the district court's opinion is reported. In each case, we think that the district court's discussion is sufficient and that no error occurred. In our view, the district court and the magistrate judge have done a very able job in handling this complex and contentious case.

*Affirmed.*