USCA1 Opinion

 

 December 1, 1995 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-2318 JAMES H. COOKE, Plaintiff, Appellee, v. LYNN SAND & STONE COMPANY, TRIMOUNT BITUMINOUS PRODUCTS COMPANY, LOUIS E. GUYOTT, II, and STUART LAMB, Defendants, Appellants. __________________ __________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued November 27, 1995, should be amended as follows: On page 3, second paragraph, line 3: Change "PBGC specified" to "PBGC-specified". On page 5, second paragraph, line 4: Change " 22," to " 22,". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-2318 JAMES H. COOKE, Plaintiff, Appellee, v. LYNN SAND & STONE COMPANY, TRIMOUNT BITUMINOUS PRODUCTS COMPANY, LOUIS E. GUYOTT, II, and STUART LAMB, Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy Gertner, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Robert M. Gault with whom Alan S. Gale and Mintz, Levin, Cohn, ________________ _____________ __________________ Ferris, Glovsky and Popeo, P.C. were on briefs for appellants. _______________________________ Joseph F. Hardcastle with whom Ralph D. Gants and Palmer & Dodge _____________________ ______________ ______________ were on brief for appellee.  ____________________ November 27, 1995 ____________________ BOUDIN, Circuit Judge. This troublesome appeal involves _____________ a determination of benefits due following the termination of a pension plan. On May 18, 1983, Trimount Bituminous Products Co. ("Trimount") purchased Lynn Sand & Stone Co. ("Lynn"). At the time of the purchase, Lynn had in place an employer-sponsored, defined-benefit pension plan. The plan was subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq. _______ At the time of the purchase, in May 1983, James Cooke was president and treasurer of Lynn and also a trustee of the plan. Shortly thereafter, Cooke was terminated as an officer under circumstances not entirely to his credit, see Cooke v. ___ _____ Lynn Sand & Stone Co., 640 N.E.2d 786 (Mass. 1994), and later _____________________ in the year Lynn replaced the trustees of the plan and voted to terminate it. Article XIV of the plan permitted Lynn to amend or terminate the plan at any time. The proposed termination required a clearance by the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that insures ERISA-covered pension plans and regulates terminations. See 29 U.S.C. 1341. When an employer ___ voluntarily terminates a single-employer, defined-benefit pension plan, all accrued benefits vest automatically, and the employer must distribute benefits in accordance with ERISA's allocation schedule. 29 U.S.C. 1344(a). Funds left over may revert to the employer if the plan so -2- -2- specifies, 29 U.S.C. 1344(d), as the Lynn plan did. The present litigation presents the question how much Cooke was entitled to receive on termination of the plan. In 1983 Cooke--who was then 53 years of age--had accrued a monthly retirement benefit of $1,856.93, starting at age 65 and continuing for ten years or until his death, whichever came first. The plan permitted the trustees to offer beneficiaries an option, in lieu of monthly payments, of receiving a lump sum distribution of equal value. Choosing to offer this option to Cooke, the trustees had to determine the present value of the promised monthly payments. Mortality assumptions aside, this required selection of a "discount" rate--effectively an assumed interest rate--to compute a present lump sum equal to the stream of promised future payments. See Robert Anthony & James Reece, ___ Accounting Principles 199-203 (1983). _____________________ The trustees retained an actuarial firm which advised that, if the trustees chose to offer lump sum payments, the appropriate choice of rates was between the PBGC-specified interest rate of 9.5 percent1 or a somewhat higher interest rate of 11 to 11.5 percent, reflecting the figure that certain insurance companies would employ if Lynn purchased  ____________________ 1The 9.5 percent figure appeared in a PBGC schedule for calculating lump-sum values of annuities as of a given plan termination date. See 29 C.F.R. 2619, App. B (1986), ___ setting forth a 9.5 percent rate for plans terminated between September 1, 1983 and February 1, 1984.  -3- -3- annuities instead of providing lump sums. The higher the rate selected, the smaller will be the lump sum needed to equal the future stream of payments. Ultimately, the actuary recommended the 9.5 percent figure, stating later that this was the actuary's best judgment as to the proper rate as well as the rate then commonly used on termination of a plan under ERISA. The use of the 9.5 percent figure equated to a lump sum payment for Cooke of $58,987.98. Cooke's attorneys disputed this computation, urging (based on certain language in the plan yet to be described) that a 6 percent rate should be used; on this premise, Cooke would have obtained a lump sum of $96,892.42. The trustees maintained their position. Ultimately, the PBGC issued a notice in September 1984, finding that the assets of the plan would be sufficient to cover all guaranteed benefits and rejecting without comment Cooke's objections as to the rate selected. On June 14, 1985, Cooke filed a complaint in the district court, contending inter alia that the use of the 9.5 _____ ____ percent interest rate violated the plan and therefore ERISA. Cross-motions for summary judgment were filed, and the district court issued an initial non-dispositive decision in July 1986, relying in part on the trustees' interpretation of the plan. See Cooke v. Lynn Sand & Stone Co., 673 F. Supp. ___ _____ ______________________ 14 (D. Mass 1986). Delay then ensued because the Supreme -4- -4- Court granted review in another case to determine the weight to be given under ERISA to a trustee's interpretation of disputed terms in a pension plan. Firestone Tire & Rubber ________________________ Co. v. Bruch, 489 U.S. 101 (1989). ___ _____ After Firestone, the present case was eventually _________ transferred to a different district judge. In the decision now before us, the district court decided that under Firestone the trustees' interpretation was entitled to no _________ weight; and based on the court's own reading of the plan, the court granted summary judgment in favor of Cooke. Cooke v. _____ Lynn Sand & Stone Co., 875 F. Supp. 880 (D. Mass. 1994). _______________________ Defendants in the district court--Lynn, Trimount and the plan trustees (collectively "Lynn")--have now appealed, arguing that their interpretation deserves weight and is in any event correct. Cooke's main argument in favor of the 6 percent rate, adopted by the district court, was that this rate was mandated by the plan and was not inconsistent with PBGC regulations. The plan states in article I, 22, that "[f]or purposes of establishing actuarial equivalence, present value shall be determined by discounting all future payments for interest and mortality on the basis specified in the [plan's] Adoption Agreement." Section 1.09 of the plan's adoption agreement, a boilerplate form with checked boxes and inserted figures, provides that in establishing actuarial -5- -5- equivalence the figure of 6 percent should be used for "[p]re-retirement interest." In response, Lynn has argued that the 6 percent provision applies where a lump sum is paid under the ongoing plan but does not apply to termination payments. Lynn points to article XIV, 2, of the plan, which states that in the event of termination, the trustee must "allocate the [plan's] assets" in accordance with 29 U.S.C. 1344. Section 1344 provides a mandatory priority schedule for plan payments on termination. Incident to this and other sections of ERISA, the PBGC has established regulations that address in some detail the determination of the interest rate to be used in lump sum computations when a plan is terminated. The key regulation, 29 C.F.R. 2619.26, is concerned with the valuing of a lump sum paid in lieu of normal monthly retirement benefits where a plan's assets are sufficient to cover all of its statutory obligations under section 1344. The regulation requires the use of "reasonable actuarial assumptions as to interest and mortality"; it directs the plan administrator to specify the assumptions when seeking termination clearance from the PBGC; it makes the assumptions subject to PBGC review and to re-evaluation of benefits if the assumptions are found unreasonable by the PBGC; and it sets forth four "interest assumptions" that are "among those that will normally be considered reasonable": -6- -6- (i) The rate by the plan for determining lump sum amounts prior to the date of termination. This rate may appear in the plan documents or may be inferred from recent plan practice. (ii) The rate used by the insurer in the qualifying bid under which the plan administrator will purchase annuities not being paid as a lump sum. . . . (iii) The interest rate used for the minimum funding standard account pursuant to section 302 of the Act and section 412(b) of the Internal Revenue Code. (iv) The PBGC interest rate for immediate annuities in effect on the valuation date set forth in Appendix B to this part. Based on this language, Lynn argues that the plan trustees were entitled to select any reasonable rate, that the 9.5 percent PBGC rate actually adopted is one of the four "normally . . . considered reasonable" under the regulation, and that the evidence of the actuary hired by Lynn shows the 9.5 percent figure was certainly reasonable here. As to the plan and adoption agreement, Lynn argues that the 6 percent provision does not apply to terminations or, if intended to apply, is overridden by the regulation. We start with the regulation because, if so intended, there is little doubt that it would override contrary plan provisions. See 29 U.S.C. 1341(a); 29 C.F.R. 2619.3(a). ___ Given the wording of the regulation and its likely purpose, we agree that section 2619.26 would override any contractual provision providing for a rate that proved to be "unreasonable" under the regulation. But the reasonableness -7- -7- or unreasonableness of the 6 percent figure cannot readily be determined on the present state of the record. Although the district court deemed the 6 percent interest rate reasonable, apparently because it was the rate specified in the plan, the regulation does no more than make the plan rate used prior to termination presumptively reasonable. Further, it appears from the record that the 6 percent interest rate would generate a lump sum sufficient to buy two annuities, each separately providing Cooke the ___ promised monthly payments. Thus, it is at least open to question whether the 6 percent figure is reasonable. The record does show that the 9.5 percent figure is reasonable-- indeed, arguably generous to Cooke--but there can be more than one reasonable rate. If we assume arguendo that 6 percent is a reasonable ________ _ rate and that the plan intended it to apply on termination, _______________________________________________________ we see no reason why the plan could not require the trustees to use that rate. It is true that the regulation might be read to reserve the choice of a reasonable rate to the trustees on termination, regardless of what the plan says. But the regulation's language does not compel that reading, and Lynn does not show that such a reading would serve any purpose; after all, the PBGC can reject a plan-specified rate if the PBGC finds the rate unreasonable.  -8- -8- We turn therefore to the contractual question whether the plan should be read to require use of the 6 percent figure not only in calculating lump sums paid during the life of the plan but also lump sums paid upon termination. The district judge who first dealt with the case deemed the plan's language ambiguous on this issue, 673 F. Supp. at 22, and we share that judgment. This led the same district judge, as the law then stood before Firestone, to adopt _________ Lynn's interpretation of the agreement as a "reasonable" interpretation proffered by the plan trustees, subject to a possible claim of bad faith. Id. ___ This solution to plan ambiguities may be a sensible one, especially because plan trustees typically (as here) retain the power to alter plan provisions by express amendment. But the Supreme Court in Firestone concluded that the trustees' _________ reading of plan language may be given weight only if the plan so provided in fairly explicit terms. Lynn does point to some plan language marginally helpful to its position, but, on balance, we agree with the district judge who took over the case after Firestone that the plan language does not _________ satisfy Firestone. See Rodriguez-Abreu v. Chase Manhattan _________ ___ _______________ _______________ Bank, N.A., 986 F.2d 580, 583-84 (1st Cir. 1983). __________ Thus, in resolving the merits we give no weight to the trustees' interpretation and review the plan language de novo __ ____ and as presenting an issue of law, Rodriguez-Abreu, 986 F.2d _______________ -9- -9- at 583, no one having suggested that there is any extrinsic evidence that reveals the actual intent of the plan's drafters. See Restatement (Second), Contracts 212(2) ___ _________________________________ (1979). The difficulty is that the plan language can be plausibly read either way. Nor is this surprising since in all likelihood the plan drafters, in completing what were largely boilerplate provisions, never had occasion to think about the variation we confront in this case. On the one hand, the plan specifies the 6 percent figure, surely with ongoing plan operations in mind but without specifically excluding a lump sum paid on termination of the plan. On the other hand, termination is the subject of a separate article; the article refers to a statutory provision; and an associated regulation provides that those terminating the plan shall select a reasonable rate. So far as bare language goes, the choice between the Cooke and Lynn readings is practically a coin flip; and the usual saws of interpretation--such as "the specific controls the general"-- could be invoked by either side.  Thus, another perspective must be sought. One might ask how the plan drafters would have resolved the problem if they had focused upon it, see Prudential Ins. Co. of America v. ___ _______________________________ Gray Mfg. Co., 328 F.2d 438, 445 (2d Cir. 1964) (Friendly, ______________ J., concurring), or try to assign the burden of proof and hold that the one having the burden has not carried it. See ___ -10- -10- United Steelworkers of America v. North Bend Terminal Co., _______________________________ ________________________ 752 F.2d 256, 261 (6th Cir. 1985). But both perspectives are debatable in application and both have been opposed in principle as well. See, e.g., Alan Farnsworth, Contracts  ___ ____ _________ 7.16, at 547 (2d ed. 1990) (rejecting "hypothetical" expectations); United Commercial Ins. Service, Inc. v. _________________________________________ Paymaster Corp., 962 F.2d 853, 856 n.2 (9th Cir.), cert. ________________ _____ denied, 113 S.Ct. 660 (1992) (disagreeing with United ______ ______ Steelworkers). ____________ We think that the proper solution in a case such as ours should turn not on "hypothetical[s]" or "fictitious intentions" but on "basic principles of justice that guide a court in extrapolating from the situations for which the parties provided to the one for which they did not." Farnsworth, supra, 7.16, at 547-48. On this basis Lynn's _____ interpretation is superior. Plan termination is a drastic and unique event; and for that occasion the PBGC regulation provides a detailed regime for selecting a reasonable interest rate. A reading of the plan that leaves that subject solely to the regulation is straightforward, workable, and far less likely to result in a tension between the plan and the regulation.  Further, it is hard to see how substantial injustice can be done to the beneficiary if the trustees are confined to choosing a "reasonable rate." By contrast, insistence on a -11- -11- fixed rate can easily produce anomalies such as the alleged double recovery that might be available to Cooke in this case; and, as Lynn points out, it could easily be the beneficiary who suffered from a very small lump sum payment if the plan's contract rate happened to be too high. Finally, letting the PBGC regulation govern increases the likelihood that the trustees will afford a lump sum option to the employee in the first place.2  One might argue that any ambiguity in an ERISA plan should be resolved in favor of the beneficiary. We take a more agnostic view of the statute. Beneficiaries come first on the priority list but only to the extent of the benefits due them; and the statute expressly permits the employer to reclaim the surplus, if the plan so permits (as it does here). 29 U.S.C. 1344(d). Such plans should be read fairly, but not automatically to maximize the award to the beneficiary. Foltz v. U.S. News & World Report, Inc., 865 _____ ________________________________ F.2d 364, 373 (D.C. Cir.), cert. denied, 490 U.S. 1108 _____________ (1989). The problem encountered in this case ought not to recur if plan administrators are vigilant. It could easily be  ____________________ 2Of course, a fixed figure might be desirable in the context of an ongoing plan, simply for the sake of speed and certainty; but in that context, there is no PBGC requirement that the specified figure be reasonable and no potential for conflict between the plan and the regulation where the plan figure is arguably unreasonable. -12- -12- resolved under a plan that explicitly gave the trustees authority to interpret in terms that meet Firestone's _________ delegation requirement. Or, a plan could explicitly provide that a specified interest rate is to be used upon _ termination, or--conversely--that the trustees on termination may select any reasonable rate. Any plan that faces up to ___ the problem can avoid the ambiguity encountered here. We have considered whether there is a need for trial on the question whether the trustees in this instance acted in bad faith, as originally alleged by Cooke. The district court did not find it necessary to pass on this issue which, were a ruling on it subject to appeal, would be reviewed de __ novo. After examining the summary judgment filings, we think ____ that Cooke's papers do not generate a trial-worthy issue on the charge of bad faith. Accordingly, we conclude that the grant of summary judgment in favor of Cooke must be set aside, and that Lynn is entitled to summary judgment in its favor. The judgment is reversed and the case remanded with ________ ________ directions to enter summary judgment in favor of Lynn. -13- -13-