Wood v. Prudential Insurance          CV-99-229-M    06/14/00

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Peter G. Wood,
    Plaintiff

    v.                                    Civil No. 99-229-M
                                          Opinion No. 2000 DNH 136
The Prudential Insurance
Company of America,
    Defendant


**O R D E R**


    Plaintiff, Peter G. Wood, brings this action under Section

502(a)(1)(B) of the Employee Retirement Income Security Act of

1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover short term

disability ("STD") benefits, and attorney's fees (29 U.S.C.

§ 1132(g)).[1]  Defendant, The Prudential Insurance Company of

America ("Prudential" or "the company"), denies that Wood is

---

[1]Wood originally brought this suit in state court seeking a
declaratory judgment that he is entitled to coverage under the
terms of an insurance policy providing disability income
coverage.  After removal to this court, Wood amended his
complaint to state an ERISA claim.

entitled to benefits.  Both parties have moved for summary judgment.


Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).  Thus, a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," should be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must view the record in the light most

2

favorable to the nonmoving party, "indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).

<u>Background</u>

Wood was employed by Prudential for some 26 years, from September 4, 1972, to March 10, 1998. As a Prudential employee, Wood participated in The Prudential Welfare Benefits Plan (the "Plan"), which provided disability income benefits for qualifying employees.

On February 26, 1998, Wood was seen by a practicing physician's assistant, Richard Renner, PA-C, for "burn-out stress." (Progress Note, 2/26/98, ex. to Renner Aff.) Renner's office notes indicate that Wood had been "feeling blue, sad, tearful, chokey, [and had been having] difficulty sleeping." <u>Id</u>. Renner diagnosed Wood as suffering from hypertension and depression, and prescribed Accupril and Prozac, noting that he felt that Wood "should be on short-term disability and not make any rash judgments until he is feeling better." <u>Id</u>. Wood

3

stopped working on March 9, 1998 (his first day of absence), and then, or shortly thereafter, notified Prudential of his claim for disability benefits.

Renner saw Wood again on March 19, 1998, for a complete physical examination. Renner noted that Wood's neurological examination was normal and that his affect had improved since his last visit. Because Wood refused to take the Prozac he had prescribed, however, Renner strongly recommended that he seek psychological help. Wood agreed and suggested the name of a psychiatrist, Marie Guay, D.O.

Wood met with Dr. Guay on April 17, 1998. Dr. Guay noted that Wood presented with symptoms including "marked anxiety, insomnia, heart palpitations, awakening from sleep in a cold sweat, nausea and vomiting prior to going to work in the morning, a decrease in energy, weight loss and elevated blood pressure." (R. at PW0413; see also Dr. Guay's psychiatric assessment of Wood at R. at PW0068-70.)[2] Dr. Guay diagnosed Wood as suffering from

[2]Citations to the record ("R.") are to the Plan Administrative Record submitted with defendant's motion for summary judgment. Pages of the record are cited by the bates-

"panic disorder without agoraphobia," a condition classified by the diagnostic code 300.01 in the <u>Diagnostic and Statistical Manual of Mental Disorders</u>, fourth edition[3] (R. at PW0083). She prescribed a trial of Paxil along with individual psychotherapy (R. at PW0070).

By letter dated April 17, 1998, Prudential notified Wood that his claim for disability benefits had been denied because he did not file it on the required Group Disability Claim Form (and so did not provide all of the information needed to rule on it). Wood completed and filed the form on or about April 21, 1998. He reported on the form that the nature of his disabling sickness or injury was "stress, pressure, anxiety[,] High Blood pressure + pulse rate [and] Panic attack Disorder." (R. at PW0076.)

In support of Wood's claim for disability benefits, Renner and Dr. Guay each completed an Attending Physician's Statement of

_____

numbers used in that document, which run from PW0001 through PW0730.

[3]<u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed., American Psychiatric Association 1994), hereinafter referred to as the DSM-IV™.

5

Disability.  Renner listed diagnoses of hypertension, anxiety, and depression and symptoms of "[f]atigue, panic attacks, nausea, [and] sleep disorder."  (R. at PW0082.)  Dr. Guay diagnosed panic disorder without agoraphobia and noted symptoms of "marked anxiety, elevated BP [blood pressure], palpitations, vomiting, [and] fatigue."  (R. at PW0083.)  Neither PA Renner nor Dr. Guay predicted when Wood would be able to return to work.

In addition, Renner conducted a "mental status exam[ination]" (MSE) of Wood on May 8, 1998, and diagnosed acute depression and acute panic attacks.  Renner described Wood's attitude as "depressed" and his mood as "nervous/anxious" with a flat affect, but noted nothing unusual or abnormal about Wood's appearance, behavior, thought content, intellectual function, or insight and judgment.[4]  (R. at PW0096.)

By letter dated June 23, 1998, Prudential again denied Wood's claim for STD benefits, writing:

> The medical information from Dr. [sic] Renner and Dr.
> Guay indicate that you have been experiencing

_____

[4]Renner's assessment of Wood's thought processes is illegible.

> difficulties related to anxiety and depression. However, the mental status exam from Dr. [sic] Renner indicates that your thought content, intellectual functioning, insight and judgment are normal. Additionally, the psychiatric assessment provided by Dr. Guay indicates that you are not suffering from major depression or severe anxiety.

(R. at PW0101.)  Prudential therefore concluded that Wood was not "suffering from an impairment that would render [him] totally disabled from [his] job as a Prudential Representative."  <u>Id</u>.

Wood, through counsel, appealed the denial of benefits by letter dated August 20, 1998.  In response to the representation that Dr. Guay had not found his anxiety to be severe, Wood submitted a letter from her confirming that he had exhibited "symptoms of a serious panic disorder" and that the severity of that disorder rendered him "currently completely disabled" and unable to perform his job at Prudential.  (R. at PW0413.)  To clarify Renner's finding of normal mental function, Wood submitted Renner's office notes of August 13, 1998, which state in relevant part:

> In subsequent visits, in any discussion regarding going back to work, [Wood] becomes incredibly nervous, anxious, nauseous, has ultimately sleep disorder and ruminating thoughts which put him into a complete

7

panic.  My sense is that despite the fact that on a day to day basis that he has a normal mentation, is able to carry on a conversation with appropriate affect.  However whenever he discusses any kind of work related business that he immediately has anticipatory anxiety and gets himself into a panic attack.  I certainly think that you can have co-existing mental states particularly when the aggravating factor you are avoiding because you are out of work. [sic] I have discussed this with [Wood's attorney] and feel that, along with Dr. [Guay], that he does not have at this time the physical and emotional capacity to work in the line of field [sic] that he has been working for the last 20 years as this induces an acute panic state.

(R. at PW0414.)

Prudential retained Marc Sageman, M.D., Ph.D, a specialist in forensic and organizational psychiatry, psychotherapy, and pharmacotherapy, to review Wood's file.  Prudential asked Dr. Sageman to "determine if there is any evidence of an acute mental impairment at the time Mr. Wood ceased work on March 9, 1998, or if he continues to suffer from an acute mental impairment at this time."  (R. at PW0430.)

After reviewing the file, Dr. Sageman informed Prudential that he found Renner's and Dr. Guay's diagnoses of Wood "puzzling."  (R. at PW0434.)  Dr. Sageman first opined that Wood could not have a depressive disorder (and noted that Dr. Guay did

8

not diagnose one) because such a disorder does not occur selectively.  In other words, depression does not strike a person only at work and not at home; it is "general throughout the day." Id.

Similarly, Dr. Sageman noted that a diagnosis of panic disorder requires that the patient suffer from "<u>recurrent unexpected</u> Panic Attacks."  <u>Id</u>.

> By definition, an unexpected (spontaneous, uncued) Panic Attack is defined as one that is not associated with a situational trigger (i.e., it occurs "out of the blue").  Furthermore, Mr. Wood's alleged attacks do not even occur situationally, e.g., at work.  They occur when he <u>thinks</u> about returning to work, and affect him so that he is unable to sleep.  This does not sound that [sic] any psychiatric disorder that I know.

<u>Id</u>.  Dr. Sageman opined that at most, Wood may have suffered a panic attack, a common event in the general population and a single occurrence of which does not constitute a panic disorder. He concluded that the materials he reviewed disclosed no evidence of mental impairment.  Citing Dr. Sageman's conclusions, Prudential upheld its denial of benefits by letter dated October 12, 1998.

Wood appealed that decision to the Appeals Committee of the Prudential Insurance Company of America ("Appeals Committee"). By letter dated February 11, 1999, the Appeals Committee upheld the prior decision. Wood challenges, in this suit, Prudential's denial of his claim for disability benefits.

## Discussion

As a preliminary matter, the parties do not agree on the applicable standard of review. Each party, however, claims entitlement to judgment on the merits regardless of the standard of review employed.

In <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." The Court of Appeals for the First Circuit has interpreted <u>Firestone</u> to require "de novo review of benefits determinations

10

unless a benefits plan clearly grants discretionary authority to the administrator.  Where the clear discretionary grant is found, _Firestone_ and its progeny mandate a deferential arbitrary and capricious standard of judicial review."  _Terry v. Bayer Corp._, 145 F.3d 28, 37 (1st Cir. 1998)(citations, internal quotation marks, ellipses, and brackets omitted).

Under the Plan, a committee of three or more employees appointed in accordance with Section 3.3(a) of the plan (the "Committee") is designated the plan administrator.  (R. at PW0584.)  The Plan provides that "Subject to oversight by the Compensation Committee, the Committee . . . shall have full and absolute discretion and authority to control and manage the operation and administration of the Plan, as specifically described herein."  (R. at PW0584.)  The Committee is granted "all powers necessary to carry out" the terms of the Plan (R. at PW0589.), including "the broadest possible discretion to interpret any and all provisions of the Plan and to determine any questions arising thereunder or in connection with the administration of the Plan."  (R. at PW0590.)

11

Wood argues that the foregoing language is similar to that found insufficient to satisfy the <u>Firestone</u> standard in <u>Cooke v. Lynn Sand & Stone Co.</u>, 70 F.3d 201, 204 (1st Cir. 1995). "There, the plan language stated only that the administrator had 'exclusive control and authority over administration of the Plan.'" <u>Terry</u>, 145 F.3d at 37 (quoting the district court opinion in <u>Cooke</u> at 875 F. Supp. 880, 883-84 (D. Mass. 1994)). As in <u>Terry</u>, however, the Plan language here goes well beyond that described in <u>Cooke</u>, in that it plainly grants discretionary determinative and interpretive authority to the Committee. <u>Terry</u>, 145 F.3d at 37 ("In contrast [to the plan in <u>Cooke</u>], Bayer's Plan specifically allocates to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan."). Accordingly, the arbitrary and capricious standard of review is applicable here. <u>See</u> <u>id</u>.

Under the arbitrary and capricious standard of review, Prudential's[5] interpretation of Plan terms cannot be disturbed if

[5]The Plan authorizes the Committee to delegate its administrative duties to others. (R. at PW0584.) With regard to disability benefits coverage, the Committee has delegated its

12

that interpretation is reasonable. See id. at 40. And, of course, the court cannot substitute its judgment for Prudential's. See id. Rather Prudential's denial of benefits must be upheld if that denial was "within [Prudential's] authority, reasoned, and supported by substantial evidence in the record. Substantial evidence, in turn, means evidence reasonably sufficient to support a conclusion." Doyle v. The Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998)(citation and internal quotation marks omitted).

Prudential denied Wood's claim for STD benefits because it determined that he failed to meet eligibility criteria requiring him to be "totally disabled," as that term is used in the Plan. The Plan provides that an employee is considered disabled for purposes of eligibility for STD benefits when the employee is "completely unable to perform any and every duty of [his]

_____

duties as plan administrator to Prudential. (R. at PW0585-87, PW0722, PW0368.) As Wood does not appear to contend that the Committee did not or could not delegate its discretionary authority to Prudential, the court will treat Prudential as the Committee's full substitute as plan administrator without further discussion.

13

occupation as a Prudential Representative, due to sickness or injury or both; and [is] not engaged in any gainful occupation." (R. at PW0024 (italics omitted); see also R. at PW0220.)[6] Wood argues that Prudential arbitrarily and capriciously interpreted the Plan to require that he meet additional criteria, not expressly set out in the written Plan.

Wood correctly points out that it is impermissible, under even the arbitrary and capricious standard of review, for a plan administrator to impose benefit eligibility criteria that do not appear in the plan. See e.g., Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997)(finding denial of disability benefits arbitrary and capricious where plan administrator imposed a requirement, not stated in the plan, that the claimant establish the etiology of her disabling condition through clinical evidence). Wood argues that Prudential did just that

---

[6]The Plan's provisions for disability benefits are incorporated by reference (R. at PW0707) from "all of the summary plan descriptions, insurance contracts, third party agreements, Employer policies, and other documentation maintained by the Employer regarding [disability benefits]." (R. at PW0722.) The court will refer to such documents as the Plan without further specification.

when it (1) asked Dr. Sageman to "determine if there is any evidence of an acute mental impairment at the time Mr. Wood ceased work on March 9, 1998, or if he continues to suffer from an acute mental impairment at this time," (R. at PW0430); and (2) denied Wood's claim for benefits for the stated reasons that his "functioning outside of the workplace is within normal limits" and "the medical records do not support a mental impairment." (R. at PW0440.)  These statements by Prudential, Wood argues, show that it impermissibly construed the Plan to impose the additional requirement that he have an "acute mental impairment and/or disability in personal and/or social functioning."  (Pl.'s Br. at 12.)

Prudential may have been imprecise in its communications to Dr. Sageman and the plaintiff, but those ambiguities do not raise a genuine issue of material fact as to whether Prudential required Wood to meet eligibility criteria for disability not found in the Plan.  The Plan's definition of disability for purposes of STD benefit eligibility requires that the employee be "completely unable to perform any and every duty of [his]

15

occupation as a Prudential Representative, <u>due to sickness or</u> <u>injury or both</u>."  (R. at PW0024 (italics omitted)(emphasis added).)  Dr. Sageman's conclusions, after reviewing Wood's file, reveal that he plainly determined and advised Prudential that Wood did not meet the diagnostic criteria for the medical conditions his psychiatrist and physician's assistant claimed he had.  (Parenthetically, it is doubtful that a physician's assistant is qualified to offer an expert diagnosis of mental illness, though the parties do not raise the issue.)

Dr. Sageman disputed Renner's diagnosis of depression because "any Depressive Disorder . . . is not selective in its occurrence."  (R. at PW0434.)  Dr. Sageman cited the DSM-IV™ criteria for Major Depressive Episode, which require that the patient experience either "depressed mood most of the day, nearly every day" or "markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day." DSM-IV™ at 327.

Similarly, Dr. Sageman disputed Dr. Guay's diagnosis of panic disorder because the DSM-IV™ diagnostic criteria for that

16

condition (either with or, as Dr. Guay diagnosed, without agoraphobia) require that the patient experience "<u>recurrent unexpected</u> Panic Attacks." (R. at PW0434 (citing DSM-IV™ at 402).) The DSM-IV™ provides that "[b]y definition, Panic Disorder is characterized by recurrent, unexpected (spontaneous, uncued, 'out of the blue') Panic Attacks." DSM-IV™ at 400. Dr. Sageman pointed out that the panic attacks Wood described were not uncued, but were apparently triggered by thoughts of returning to work.[7]

_____

[7]While Dr. Sageman's report might give a contrary impression, panic attacks having situational triggers are recognized. The DSM-IV™ categorizes panic attacks into three types, one of which is described as "situationally bound (cued) Panic Attacks, in which the Panic Attack almost invariably occurs immediately on exposure to, or in anticipation of, the situational cue or trigger (e.g. seeing a snake or dog always triggers an immediate Panic Attack)." DSM-IV™ at 395 (bold type omitted). This type of panic attack is most closely associated with phobias. <u>Id</u>.

The DSM-IV™ also describes situations in which an unexpected panic attack can lead to phobic avoidance: "For example, an individual who had not previously feared or avoided elevators has a Panic Attack in an elevator and begins to dread going to work because of the need to take the elevator to his office on the 24th floor." DSM-IV™ at 409 (the DSM-IV™ describes that situation as falling between the prototypes of Panic Disorder with Agoraphobia, which "is characterized by the initial onset of

17

Prudential therefore argues that it properly relied on Dr.

Sageman's conclusions to determine that Wood was not totally

---

unexpected Panic Attacks and the subsequent avoidance of multiple situations thought to be likely triggers of the Panic Attacks," and Specific Phobia, Situational Type, which "is characterized by situational avoidance in the absence of recurrent unexpected Panic Attacks," and notes that appropriately diagnosing a specific presentation of symptoms as one or the other of those disorders requires the exercise of clinical judgment. Id.)

The foregoing observations raise the question whether Wood might have a mental impairment other than those diagnosed by Renner and Dr. Guay. Dr. Sageman, undoubtedly familiar with the recognized types of panic attacks, appears to have concluded that the medical records before him did not support a diagnosis involving situationally bound panic attacks. He wrote "[t]here is no evidence that Mr. Wood suffered from a traumatic experience so severe at work that the mere mention of work triggers panic attacks." (R. at PW0434.)

That conclusion does not, of course, resolve whether Wood's alleged panic attacks are, in fact, attributable to an undiagnosed mental disorder. But that was not the question before Dr. Sageman, notwithstanding Prudential's instructions. Dr. Sageman's assigned duty was to determine whether the medical evidence presented by Wood supported the diagnoses of the conditions he claimed disabled him. Neither Dr. Sageman nor Prudential was required to speculate as to whether there existed other evidence not presented that might support a finding of disability. Cf. Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994) (noting that insurer/plan fiduciary "was bound only to consider what evidence and information it had before it"). Nor is the court in a position to determine whether Wood is actually disabled by an undiagnosed mental illness.

18

disabled by any "sickness or injury" as required by the Plan. The court agrees, although Prudential has not taken the argument far enough. In determining that Wood did not meet the criteria for total disability, Prudential must have implicitly interpreted the "sickness or injury" requirement[8] as mandating that a claimant satisfy a two part test: that he (1) meet the diagnostic criteria generally recognized or accepted by the relevant medical community (here, the accepted diagnostic criteria of the mental health community as reflected in the DSM-IV™) for (2) the sickness or injury he claims to have (here, depression,

_____

[8]The Plan documents define sickness, in relevant part, as "[a]ny disorder of the body or mind of a Covered Person, but not an Injury." (R. at PW0055.)

19

"anxiety,"[9] and panic disorder without agoraphobia).[10] That necessary interpretation of the eligibility criteria is not unreasonable, and therefore, not arbitrary or capricious. <u>Cf</u>. <u>DuMond v. Centex Corp.</u>, 172 F.3d 618 (8th Cir. 1999) (upholding denial of benefits where, although plan administrator admitted that Chronic Fatigue Syndrome ("CFS") was an organic disease covered under the plan, an independent medical review determined that claimant did not meet the Center for Disease Control's diagnostic criteria for CFS); <u>Donato</u>, 19 F.3d at 382-82 (noting

---

[9]In his attending physician's statement of disability, Renner diagnosed Wood as suffering from "anxiety" in addition to depression and hypertension. (R. at PW0082.) Although "anxiety" is not a diagnosis classified in the DSM-IV™, Renner appears to have also listed the diagnostic code 300.00, <u>id</u>., which indicates the diagnosis of "Anxiety Disorder Not Otherwise Specified" – essentially a catch-all diagnosis for "disorders with prominent anxiety or phobic avoidance that do not meet criteria for any specific" listed disorder. DSM-IV™ at 444.

[10]Wood's description of his disabling sickness or injury in his claim for disability benefits also listed "stress" and "pressure," as well as high blood pressure and pulse rate. (R. at PW0076.) Neither Renner nor Dr. Guay, however, appears to have considered Wood's diagnosed hypertension, by itself, to be disabling. Rather, they listed it as a symptom or objective clinical finding associated with the anxiety and depression that they believed caused Wood to stop working. (<u>See</u> R. at PW0082-83.)

20

that "ERISA and its implementing regulations . . . did not require [the insurer/plan fiduciary] to assess an alternative diagnosis to the one [the claimant] submitted for disability benefits . . . much less to determine whether that alternative diagnosis constitutes a total disability").[11]

Finally, Wood argues that Prudential acted arbitrarily and capriciously in (1) failing to request or obtain an independent medical examination ("IME") if it had doubts about his disability – which it could have done under the Plan's terms, and (2) rejecting the opinions of his treating physicians in favor of that of Dr. Sageman, who never examined him. Prudential correctly points out, however, that while an IME is authorized by the Plan, it is not required. See R. at PW0220, PW0719; see also

---

[11]It is doubtful that the physician's assistant's "catch-all" diagnosis obligated Prudential to scour the record and the DSM-IV™ to determine whether Wood might have a mental disorder not identified by his psychiatrist. In any event, Dr. Sageman appears to have considered other possible diagnoses, see supra note 7, and concluded that the evidence was insufficient to support any of them. (See R. at PW0434 (stating that Wood's symptoms did not sound like "any psychiatric disorder that I know.") Wood has raised no genuine issue of material fact regarding whether that conclusion was unreasonable.

21

<u>Eriksen v. Metropolitan Life Ins. Co.</u>, 39 F. Supp. 2d 864, 871 n.6 (E.D. Mich. 1999) (failing to order an IME was not arbitrary and capricious where Plan did not require one).  Two days prior to contacting Dr. Sageman about the case, a Prudential disability claim manager recorded the following explanation for not requiring an IME:

> [Wood's] attny is appealing our decision to deny [Wood's] claim effective 3-9-98.  After discussion of information already in file, in addition to letter submitted by attny, it appears that our best course of action at this time would be to have a file review done of the information already contained in [Wood's] claim. This appears to be a better choice than an IME b/c we want to evaluate [Wood's] condition at the time we denied claim and do not necessarily want exam done that would present us with information as to [Wood's] condition presently.

(R. at PW0482.)  That analysis also seems reasonable.  <u>Cf.</u> <u>Robinson v. Phoenix Home Life Mut. Ins. Co.</u>, 7 F. Supp. 2d 623, 632 (D. Md. 1998) (holding insurer's claim review not defective for failure to order IME where employee claimed he was totally disabled on October 28, 1994, and "[i]t would have been only marginally relevant to plaintiff's medical condition in 1994 to

22

have had an independent examination made two years later in 1996").

The court also rejects the argument that Prudential's decision was based on an improper favoring of a non-examining physician's conclusions over the opinions of Wood's treating physicians, particularly when the reviewing physician indicated that his own opinion may not be reliable. Wood first notes that in a telephone conversation with a Prudential disability claim manager, Dr. Sageman stated that "it might not be possible to make a thorough evaluation based on records alone." (R. at PW0554.) Prudential counters by pointing out that Dr. Sageman made the statement before ever seeing the records he was asked to review. Dr. Sageman, once in receipt of the records, commented that the documentation on Wood's alleged panic attacks was "rather flimsy," (R. at PW0434), but that comment is consistent with his conclusion that the records did not establish that Wood suffered from the illnesses claimed – indeed, the "flimsy" record is attributable to Wood's failure to establish his claim. Cf. Hightshue v. AIG Life Ins. Co., 135 F.3d 1144, 1148 (7th Cir.

23

1998) (Claims administrator was entitled to rely on conclusions of independent non-examining physician where the physician was provided all medical records the administrator had and there was "nothing in the record to suggest that [the physician] felt that he did not have adequate information to render a reliable opinion.")

Furthermore, Dr. Sageman did not disregard the clinical findings and observations of Wood's treating physician and physician's assistant. Rather, accepting them completely, Dr. Sageman found that those reports simply did not support the diagnoses Wood's psychiatrist and physician's assistant made. That type of expert medical review was not unreasonable in this case. Cf. DuMond, 172 F.3d at 622 (finding the argument that the court "should give more weight to the treating physician than a reviewing physician . . . unavailing as the records submitted by [claimant's] doctors do not support a diagnosis of [claimant's allegedly disabling illness]").

Whether Wood can perfect his claim with a more apt, and better supported, diagnosis is of course not the issue here. See

24

supra note 7. The pending issue is whether the Plan acted arbitrarily in denying his claim as presented, and clearly it did not. If Wood was and remains disabled within the meaning of the Plan, he must adequately present and establish the illness he suffers from and its debilitating effects.

Conclusion

For the foregoing reasons Prudential's denial of Wood's claim for disability benefits was not arbitrary or capricious. Accordingly, Wood's motion for summary judgment (document no. 12) is necessarily denied and Prudential's motion for summary judgment (document no. 13) is necessarily granted. The Clerk of the Court is directed to enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 14, 2000

cc:   Gregory D. Wirth, Esq.
      Edward A. Haffer, Esq.
      Lonie A. Hassel, Esq.